BUSH, GOVERNOR OF TEXAS, ET AL. *v.* VERA ET AL.

No. 94–805.   Argued December 5, 1995—Decided June 13, 1996*

---

*Together with No. 94–806, *Lawson et al.* v. *Vera et al.*, and No. 94–988, *United States* v. *Vera et al.*, also on appeal from the same court.

954

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined. O'CONNOR, J., also filed a separate concurring opinion, *post*, p. 990. KENNEDY, J., filed a concurring opinion, *post*, p. 996. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined, *post*, p. 999. STEVENS, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 1003. SOUTER, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 1045.

*Javier Aguilar,* Special Assistant Attorney General of Texas, argued the cause for appellants in No. 94–805. With him on the briefs were *Dan Morales,* Attorney General, *Jorge Vega,* First Assistant Attorney General, *Richard E. Gray III,* and *Roger Moore.*

*Deputy Solicitor General Bender* argued the cause for the United States in No. 94–988. With him on the briefs were *Solicitor General Days, Assistant Attorney General Patrick, Irving L. Gornstein,* and *Steven H. Rosenbaum.*

*Penda D. Hair* argued the cause and filed briefs for appellants in No. 94–806. With her on the briefs were *Elaine R. Jones, Theodore M. Shaw, Norman J. Chachkin, Antonia Hernandez, Anthony E. Chavez, Carmen Rumbaut,* and *Lawrence Boz.*

*Daniel E. Troy* argued the cause for appellees in all cases. With him on the brief were *Paul Loy Hurd, Bert W. Rein,* and *Michael E. Toner.*†

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE KENNEDY join.

This is the latest in a series of appeals involving racial gerrymandering challenges to state redistricting efforts in the wake of the 1990 census. See *Shaw* v. *Hunt, ante,* p. 899 *(Shaw II); United States* v. *Hays,* 515 U. S. 737 (1995); *Miller* v. *Johnson,* 515 U. S. 900 (1995); *Shaw* v. *Reno,* 509 U. S. 630 (1993) *(Shaw I).* That census revealed a population in-

---

†*Paul M. Smith, Donald B. Verrilli, Jr.,* and *J. Gerald Hebert* filed a brief for the Democratic National Committee et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Pacific Legal Foundation by *Anthony T. Caso* and *Deborah J. La Fetra;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amicus curiae* were filed for the Institute for Justice by *William H. Mellor III, Clint Bolick,* and *Scott G. Bullock;* and for A. J. Pate by *William C. Owens, Jr.*

crease, largely in urban minority populations, that entitled Texas to three additional congressional seats. In response, and with a view to complying with the Voting Rights Act of 1965 (VRA), 79 Stat. 437, as amended, 42 U. S. C. § 1973 *et seq.,* the Texas Legislature promulgated a redistricting plan that, among other things, created District 30, a new majority-African-American district in Dallas County; created District 29, a new majority-Hispanic district in and around Houston in Harris County; and reconfigured District 18, which is adjacent to District 29, to make it a majority-African-American district. The Department of Justice precleared that plan under VRA § 5 in 1991, and it was used in the 1992 congressional elections.

The plaintiffs, six Texas voters, challenged the plan, alleging that 24 of Texas' 30 congressional districts constitute racial gerrymanders in violation of the Fourteenth Amendment. The three-judge United States District Court for the Southern District of Texas held Districts 18, 29, and 30 unconstitutional. *Vera* v. *Richards,* 861 F. Supp. 1304 (1994). The Governor of Texas, private intervenors, and the United States (as intervenor) now appeal. We noted probable jurisdiction. 515 U. S. 1172 (1995). Finding that, under this Court's decisions in *Shaw I* and *Miller,* the district lines at issue are subject to strict scrutiny, and that they are not narrowly tailored to serve a compelling state interest, we affirm.

I

As a preliminary matter, the State and private appellants contest the plaintiffs' standing to challenge these districts. Plaintiff Chen resides in Texas congressional District 25, and has not alleged any specific facts showing that he personally has been subjected to any racial classification. Under our decision in *Hays,* he lacks standing. See *Hays, supra,* at 744–745. But plaintiffs Blum and Powers are residents of District 18, plaintiffs Thomas and Vera are residents of District 29, and plaintiff Orcutt is a resident of District 30. We

stated in *Hays* that "[w]here a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Ibid.;* accord, *Miller, supra,* at 910–911. Under this rule, these plaintiffs have standing to challenge Districts 18, 29, and 30.

## II

We must now determine whether those districts are subject to strict scrutiny. Our precedents have used a variety of formulations to describe the threshold for the application of strict scrutiny. Strict scrutiny applies where "redistricting legislation . . . is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles," *Shaw I, supra,* at 642, or where "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines," *Miller,* 515 U. S., at 913, and "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *id.,* at 916. See also *id.,* at 928 (O'CONNOR, J., concurring) (strict scrutiny only applies where "the State has relied on race in substantial disregard of customary and traditional districting practices").

Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. See *Shaw I, supra,* at 646. Nor does it apply to all cases of intentional creation of majority-minority districts. See *DeWitt* v. *Wilson,* 856 F. Supp. 1409 (ED Cal. 1994) (strict scrutiny did not apply to an intentionally created compact majority-minority district), summarily aff'd, 515 U. S. 1170 (1995); cf. *Shaw I, supra,* at 649 (reserving this question). Electoral district lines are "facially race neutral," so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of "classifications based explicitly on race." See *Adarand Constructors, Inc.* v. *Peña,* 515 U. S.

200, 213 (1995); cf. *post*, at 999–1000, 1002–1003 (THOMAS, J., concurring in judgment) (assimilating our redistricting cases to *Adarand*). For strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were "subordinated" to race. *Miller*, 515 U. S., at 916. By that, we mean that race must be "*the predominant* factor motivating the legislature's [redistricting] decision." *Ibid.* (emphasis added). We thus differ from JUSTICE THOMAS, who would apparently hold that it suffices that racial considerations be *a* motivation for the drawing of a majority-minority district. See *post*, at 1002.

The present suit is a mixed motive suit. The appellants concede that one of Texas' goals in creating the three districts at issue was to produce majority-minority districts, but they also cite evidence that other goals, particularly incumbency protection (including protection of "functional incumbents," *i. e.*, sitting members of the Texas Legislature who had declared an intention to run for open congressional seats), also played a role in the drawing of the district lines. The record does not reflect a history of " '*purely* race-based' " districting revisions. Cf. *Miller, supra,* at 918 (emphasis added). A careful review is, therefore, necessary to determine whether these districts are subject to strict scrutiny. But review of the District Court's findings of primary fact and the record convinces us that the District Court's determination that race was the "predominant factor" in the drawing of each of the districts must be sustained.

We begin with general findings and evidence regarding the redistricting plan's respect for traditional districting principles, the legislators' expressed motivations, and the methods used in the redistricting process. The District Court began its analysis by rejecting the factual basis for appellants' claim that Texas' challenged "districts cannot be unconstitutionally bizarre in shape because Texas does not have and never has used traditional redistricting principles such as natural geographical boundaries, contiguity, compactness,

and conformity to political subdivisions." 861 F. Supp., at 1333. The court instead found that "generally, Texas has not intentionally disregarded traditional districting criteria," and that only one pre-1991 congressional district in Texas was comparable in its irregularity and noncompactness to the three challenged districts. *Id.*, at 1334. The court also noted that "compactness as measured by an 'eyeball' approach was much less important," *id.*, at 1313, n. 9, in the 1991 plan, App. 144, than in its predecessor, the 1980 Texas congressional districting plan, *id.*, at 138, and that districts were especially irregular in shape in the Dallas and Harris County areas where the challenged districts are located, see 861 F. Supp., at 1313, n. 9.

These findings comport with the conclusions of an instructive study that attempted to determine the relative compactness of districts nationwide in objective, numerical terms. That study gave Texas' 1980 districting plan a roughly average score for the compactness and regularity of its district shapes, but ranked its 1991 plan among the worst in the Nation. See Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After *Shaw* v. *Reno*, 92 Mich. L. Rev. 483, 571–573, table 6 (1993). The same study ranked Districts 18, 29, and 30 among the 28 least regular congressional districts nationwide. See *id.*, at 565, table 3. Our own review gives us no reason to disagree with the District Court that the districts at issue "have no integrity in terms of traditional, neutral redistricting criteria," 861 F. Supp., at 1339.

The District Court also found substantial direct evidence of the legislature's racial motivations. The State's submission to the Department of Justice for preclearance under VRA § 5 reports a consensus within the legislature that the three new congressional districts

> "'should be configured in such a way as to allow members of racial, ethnic, and language minorities to elect Congressional representatives. Accordingly, the three

new districts include a predominantly black district drawn in the Dallas County area [District 30] and predominantly Hispanic districts in the Harris County area [District 29] and in the South Texas region. In addition to creating the three new minority districts, the proposed Congressional redistricting plan increases the black voting strength of the current District 18 (Harris County) by increasing the population to assure that the black community may continue to elect a candidate of its choice.'" *Id.*, at 1315 (quoting Narrative of Voting Rights Act Considerations in Affected Districts, reprinted in App. 104–105).

The appellants also conceded in this litigation that the three districts at issue "were created for the purpose of enhancing the opportunity of minority voters to elect minority representatives to Congress." 861 F. Supp., at 1337. And testimony of individual state officials confirmed that the decision to create the districts now challenged as majority-minority districts was made at the outset of the process and never seriously questioned.

The means that Texas used to make its redistricting decisions provides further evidence of the importance of race. The primary tool used in drawing district lines was a computer program called "REDAPPL." REDAPPL permitted redistricters to manipulate district lines on computer maps, on which racial and other socioeconomic data were superimposed. At each change in configuration of the district lines being drafted, REDAPPL displayed updated racial composition statistics for the district as drawn. REDAPPL contained racial data at the block-by-block level, whereas other data, such as party registration and past voting statistics, were only available at the level of voter tabulation districts (which approximate election precincts). The availability and use of block-by-block racial data was unprecedented; before the 1990 census, data were not broken down beyond the census tract level. See App. 123. By providing uniquely

detailed racial data, REDAPPL enabled districters to make more intricate refinements on the basis of race than on the basis of other demographic information. The District Court found that the districters availed themselves fully of that opportunity:

> "In numerous instances, the correlation between race and district boundaries is nearly perfect. . . . The borders of Districts 18, 29, and 30 change from block to block, from one side of the street to the other, and traverse streets, bodies of water, and commercially developed areas in seemingly arbitrary fashion until one realizes that those corridors connect minority populations." 861 F. Supp., at 1336.

These findings—that the State substantially neglected traditional districting criteria such as compactness, that it was committed from the outset to creating majority-minority districts, and that it manipulated district lines to exploit unprecedentedly detailed racial data—together weigh in favor of the application of strict scrutiny. We do not hold that any one of these factors is independently sufficient to require strict scrutiny. The Constitution does not mandate regularity of district shape, see *Shaw I*, 509 U. S., at 647, and the neglect of traditional districting criteria is merely necessary, not sufficient. For strict scrutiny to apply, traditional districting criteria must be *subordinated to race*. *Miller*, 515 U. S., at 916. Nor, as we have emphasized, is the decision to create a majority-minority district objectionable in and of itself. The direct evidence of that decision is not, as JUSTICE STEVENS suggests, *post*, at 1024, "the real key" to our decision; it is merely one of several essential ingredients. Nor do we "condemn state legislation merely because it was based on accurate information." *Post*, at 1031, n. 28. The use of sophisticated technology and detailed information in the drawing of majority-minority districts is no more objectionable than it is in the drawing of majority-majority dis-

tricts. But, as the District Court explained, the direct evidence of racial considerations, coupled with the fact that the computer program used was significantly *more* sophisticated with respect to race than with respect to other demographic data, provides substantial evidence that it was race that led to the neglect of traditional districting criteria here. We must therefore consider what role other factors played in order to determine whether race predominated.

Several factors other than race were at work in the drawing of the districts. Traditional districting criteria were not *entirely* neglected: Districts 18 and 29 maintain the integrity of county lines; each of the three districts takes its character from a principal city and the surrounding urban area; and none of the districts is as widely dispersed as the North Carolina district held unconstitutional in *Shaw II, ante,* p. 899. (These characteristics are, however, unremarkable in the context of large, densely populated urban counties.) More significantly, the District Court found that incumbency protection influenced the redistricting plan to an unprecedented extent:

> "[A]s enacted in Texas in 1991, many incumbent protection boundaries sabotaged traditional redistricting principles as they routinely divided counties, cities, neighborhoods, and regions. For the sake of maintaining or winning seats in the House of Representatives, Congressmen or would-be Congressmen shed hostile groups and potential opponents by fencing them out of their districts. The Legislature obligingly carved out districts of apparent supporters of incumbents, as suggested by the incumbents, and then added appendages to connect their residences to those districts. The final result seems not one in which the people select their representatives, but in which the representatives have selected the people." 861 F. Supp., at 1334 (citations and footnotes omitted).

See also *id.*, at 1317–1318 (describing specific evidence of incumbency protection efforts statewide). This finding receives inferential support from the fact that all but one of Texas' 27 incumbents won in the 1992 elections. See *id.*, at 1318. And the appellants point to evidence that in many cases, race correlates strongly with manifestations of community of interest (for example, shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches) and with the political data that are vital to incumbency protection efforts, raising the possibility that correlations between racial demographics and district lines may be explicable in terms of nonracial motivations. For example, a finding by a district court that district lines were drawn in part on the basis of evidence (other than racial data) of where communities of interest existed might weaken a plaintiff's claim that race predominated in the drawing of district lines. Cf. *post*, at 1049 (SOUTER, J., dissenting) (recognizing the legitimate role of communities of interest in our system of representative democracy).

Strict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones. We have not subjected political gerrymandering to strict scrutiny. See *Davis* v. *Bandemer*, 478 U. S. 109, 132 (1986) (White, J., plurality opinion) ("[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole"); *id.*, at 147 (O'CONNOR, J., concurring in judgment) ("[P]urely political gerrymandering claims" are not justiciable). And we have recognized incumbency protection, at least in the limited form of "avoiding contests between incumbent[s]," as a legitimate state goal. See *Karcher* v. *Daggett*, 462 U. S. 725, 740 (1983); *White* v. *Weiser*, 412 U. S. 783, 797 (1973); *Burns* v. *Richardson*, 384 U. S. 73, 89, n. 16 (1966); cf. *Gaffney* v. *Cummings*, 412 U. S. 735, 751–754, and 752, n. 18 (1973) (State may draw irregular district lines in order

to allocate seats proportionately to major political parties). Because it is clear that race was not the only factor that motivated the legislature to draw irregular district lines, we must scrutinize each challenged district to determine whether the District Court's conclusion that race predominated over legitimate districting considerations, including incumbency, can be sustained.

### A

The population of District 30 is 50% African-American and 17.1% Hispanic. Fifty percent of the district's population is located in a compact, albeit irregularly shaped, core in south Dallas, which is 69% African-American. But the remainder of the district consists of narrow and bizarrely shaped tentacles—the State identifies seven "segments"—extending primarily to the north and west. See App. 335; see also M. Barone & G. Ujifusa, Almanac of American Politics 1996, p. 1277 (1995) (describing the district). Over 98% of the district's population is within Dallas County, see App. 118, but it crosses two county lines at its western and northern extremities. Its western excursion into Tarrant County grabs a small community that is 61.9% African-American, *id.*, at 331; its northern excursion into Collin County occupies a hook-like shape mapping exactly onto the only area in the southern half of that county with a combined African-American and Hispanic percentage population in excess of 50%, *id.*, at 153. The District Court's description of the district as a whole bears repeating:

> "The district sprawls throughout Dallas County, deliberately excludes the wealthy white neighborhoods of Highland Park and University Park and extends fingers into Collin County, which include the outermost suburbs of Dallas. In Collin County, the district picks up a small African-American neighborhood. The district extends into Tarrant County only to pick up a small border area with a high African-American concentration. It

> also reaches out to claim Hamilton Park, an affluent African-American neighborhood surrounded by whites. Part of the district runs along Trinity River bottom, using it to connect dispersed minority population. Numerous [voter tabulation districts] were split in order to achieve the population mix required for the district.

> ".... It is at least 25 miles wide and 30 miles long." 861 F. Supp., at 1337–1338.

See also Appendix A to this opinion (outline of District 30).

Appellants do not deny that District 30 shows substantial disregard for the traditional districting principles of compactness and regularity, or that the redistricters pursued unwaveringly the objective of creating a majority-African-American district. But they argue that its bizarre shape is explained by efforts to unite communities of interest in a single district and, especially, to protect incumbents.

Appellants highlight the facts that the district has a consistently urban character and has common media sources throughout, and that its tentacles include several major transportation lines into the city of Dallas. These factors, which implicate traditional districting principles, do correlate to some extent with the district's layout. But we see no basis in the record for displacing the District Court's conclusion that race predominated over them, particularly in light of the court's findings that the State's supporting data were not "available to the Legislature in any organized fashion before District 30 was created," 861 F. Supp., at 1338, and that they do not "differentiate the district from surrounding areas," *ibid.*, with the same degree of correlation to district lines that racial data exhibit, see App. 150. In reaching that conclusion, we do not, as JUSTICE STEVENS fears, require States engaged in redistricting to compile "a comprehensive administrative record," *post*, at 1026 (STEVENS, J., dissenting), and we do not dismiss facts not explicitly mentioned in the redistricting plan's legislative history as "irrelevant,"

*ibid.* If, as may commonly happen, traditional districting principles are substantially followed without much conscious thought, they cannot be said to have been "subordinated to race." In considering whether race was the "predominant factor motivating the legislatur[e]," it is, however, *evidentially* significant that at the time of the redistricting, the State had compiled detailed racial data for use in redistricting, but made no apparent attempt to compile, and did not refer specifically to, equivalent data regarding communities of interest.

Appellants present a more substantial case for their claim that incumbency protection rivaled race in determining the district's shape. Representative Johnson was the principal architect of District 30, which was designed in part to create a safe Democratic seat for her. At an early stage in the redistricting process, Johnson submitted to the state legislature a plan for Dallas County with a relatively compact 44% African-American district that did not violate the integrity of any voter tabulation district or county lines. See App. 139; 861 F. Supp., at 1338. The District Court found that "[w]hile minority voters did not object" to it, *id.*, at 1330, "[t]hat plan drew much opposition from incumbents and was quickly abandoned," *id.*, at 1321, n. 22. "[F]ive other congressmen would have been thrown into districts other than the ones they currently represent." *Id.*, at 1330–1331. Appellants also point to testimony from Johnson and others to the effect that the incumbents of the adjacent Democratic Districts 5 and 24 exerted strong and partly successful efforts to retain predominantly African-American Democratic voters in their districts. (There was evidence that 97% of African-American voters in and around the city of Dallas vote Democrat.) See generally *id.*, at 1321–1322.

In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines. And

the fact that, "[a]s it happens, . . . many of the voters being fought over [by the neighboring Democratic incumbents] were African-American," *id.*, at 1338, would not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation. See *Shaw I,* 509 U. S., at 646. If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify, just as racial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime, cf. *post,* at 1032, n. 30 (STEVENS, J., dissenting) (discussing *United States* v. *Armstrong, ante,* at 456.

If the State's goal is otherwise constitutional political gerrymandering, it is free to use the kind of political data on which JUSTICE STEVENS focuses—precinct general election voting patterns, *post,* at 1030, precinct primary voting patterns, *post,* at 1017, and legislators' experience, *post,* at 1026—to achieve that goal regardless of its awareness of its racial implications and regardless of the fact that it does so in the context of a majority-minority district. To the extent that the District Court suggested the contrary, it erred. But to the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation. Cf. *Powers* v. *Ohio,* 499 U. S. 400, 410 (1991) ("Race cannot be a proxy for determining juror bias or competence"). We cannot agree with the dissenters, see *post,* at 1031 (STEVENS, J., dissenting); *post,* at 1051–1052, n. 5 (SOUTER, J., dissenting); see also *Shaw II, ante,* at 924–925, n. 4 (STEVENS, J., dissenting), that racial stereotyping that we have scrutinized closely in the context of jury service can pass without justification in the context of voting. If the promise of the Reconstruction Amendments, that our Nation is to be free of state-sponsored discrimination, is to be upheld, we cannot pick and choose between the basic forms of

political participation in our efforts to eliminate unjustified racial stereotyping by government actors.

Here, the District Court had ample bases on which to conclude both that racially motivated gerrymandering had a qualitatively greater influence on the drawing of district lines than politically motivated gerrymandering, and that political gerrymandering was accomplished in large part by the use of race as a proxy. The State's own VRA § 5 submission explains the drawing of District 30, and the rejection of Johnson's more compact plan, in exclusively racial terms:

> "Throughout the course of the Congressional redistricting process, the lines of the proposed District 30 were constantly reconfigured in an attempt to maximize the voting strength for this black community in Dallas County . . . While the legislature was in agreement that a safe black district should be drawn in the Dallas County area, the real dispute involved the composition, configuration and *quality* of that district. The community insisted that [a] 'safe' black district be drawn that had a total black population of at least 50%. . . .

> ". . . Although some [alternative] proposals showed a more compact configuration, none of them reached the threshold 50% total black population which the community felt was necessary to assure its ability to elect its own Congressional representative without having to form coalitions with other minority groups. . . .

> ". . . The goal was to not only create a district that would maximize the opportunity for the black community to elect a Congressional candidate of its choice in 1992, but also one that included some of the major black growth areas which will assure continued electoral and economic opportunities over the next decades." App. 106–107.

As the District Court noted, testimony of state officials in earlier litigation (in which District 30 was challenged as a political gerrymander) contradicted part of their testimony

here, and affirmed that "race was the primary consideration in the construction of District 30." 861 F. Supp., at 1338; see also *id.*, at 1319–1321. And Johnson explained in a letter to the Department of Justice written at the end of the redistricting process that incumbency protection had been achieved by using race as a proxy:

> " 'Throughout the course of the Congressional redistricting process, the lines were continuously reconfigured to assist in protecting the Democratic incumbents in the Dallas/Fort Worth metroplex area by spreading the Black population to increase the Democratic party index in those areas.' " *Id.*, at 1322 (quoting Plaintiff Exh. 6E6).

This is not to say that the direct evidence of the districters' intent showed race to be the sole factor considered. As Justice Stevens notes, *post*, at 1024–1025, nn. 23–24, state officials' claims have changed as their interests have changed. In the prior political gerrymandering suit and to the Department of Justice, they asserted that race predominated. In this suit, their testimony was that political considerations predominated. These inconsistent statements must be viewed in light of their adversarial context. But such questions of credibility are matters for the District Court, and we simply differ from the dissenters in our reading of the record when they find insupportable the District Court's reliance on the State's own statements indicating the importance of race, see *post*, at 1024–1025, nn. 23–24, 1033, n. 31 (opinion of Stevens, J.).

Finally, and most significantly, the objective evidence provided by the district plans and demographic maps suggests strongly the predominance of race. Given that the districting software used by the State provided only racial data at the block-by-block level, the fact that District 30, unlike Johnson's original proposal, splits voter tabulation districts and even individual streets in many places, see App. 150; 861

F. Supp., at 1339, suggests that racial criteria predominated over other districting criteria in determining the district's boundaries. And, despite the strong correlation between race and political affiliation, the maps reveal that political considerations were subordinated to racial classification in the drawing of many of the most extreme and bizarre district lines. For example, the northernmost hook of the district, where it ventures into Collin County, is tailored perfectly to maximize minority population, see App. 153 (all whole and parts of 1992 voter tabulation districts within District 30's Collin County hook have a combined African-American and Hispanic population in excess of 50%, with an average African-American population of 19.8%, *id.*, at 331, while the combined African-American and Hispanic population in all surrounding voter tabulation districts, and the other parts of split districts, in Collin County is less than 25%), whereas it is far from the shape that would be necessary to maximize the Democratic vote in that area, see *id.*, at 196 (showing a Republican majority, based on 1990 voting patterns in seven of the eight 1990 voter tabulation districts wholly or partly included in District 30 in Collin County).*

---

*In the application of our precedents to District 30, our disagreement with JUSTICE STEVENS' dissent, *post*, at 1014–1031, is largely factual. In reviewing the District Court's findings of primary fact, we cannot ignore the reality that the District Court heard several days of testimony and argument and became significantly more familiar with the factual details of this suit than this Court can be. We therefore believe that the dissent errs in second-guessing the District Court's assessment of the witnesses' testimony, see *post*, at 1025, n. 24, and in dismissing as mere "fine tuning," *post*, at 1030, the practice of using race as a proxy that the District Court found, based on ample evidence, to be pervasive, see *Vera* v. *Richards*, 861 F. Supp 1304, 1322 (SD Tex. 1994).

For the same reason, we decline to debate the dissent on every factual nuance on which it diverges from the District Court's, and our, view. But two of its specific claims about District 30 merit a response. First, the dissent asserts that "[a] comparison of the *1992* precinct results with a depiction of the proportion of black population in each census block reveals that Democratic-leaning precincts cover a far greater area [of District 30]

The combination of these factors compels us to agree with the District Court that "the contours of Congressional District 30 are unexplainable in terms other than race." 861 F. Supp., at 1339. It is true that District 30 does not evince a consistent, single-minded effort to "segregate" voters on the basis of race, *post*, at 1023 (STEVENS, J., dissenting), and does not represent "apartheid," *post*, at 1054, 1074 (SOUTER, J., dissenting). But the fact that racial data were used in complex ways, and for multiple objectives, does not mean that race did not predominate over other considerations. The record discloses intensive and pervasive use of race both

---

than majority-black census blocks." *Post*, at 1030 (emphasis added). While that may be true, the dissent's reliance on *1992* election results is misplaced. Those results were not before the legislature when it drew the district lines in 1991, and may well reflect the popularity and campaign success of Representative Johnson more than the party political predispositions of the district's residents. (The same error infects the dissent's discussion of the Collin County hook, *post*, at 1020–1021, n. 19 (relying on 1992 election results).) And looking at totals, rather than at the difference between areas just inside and just outside the district lines, is misleading: Race may predominate in the drawing of district lines because those lines are finely drawn to maximize the minority composition of the district, notwithstanding that in an overwhelmingly Democratic area, the total of Democrats in the district far exceeds its total minority population.

Second, the dissent suggests that strict scrutiny should not apply because District 30's compact core has a higher African-American population percentage than its wayward tentacles. *Post*, at 1021–1023. In doing so, it again ignores the necessity of determining whether race predominated in the redistricters' actions *in light of what they had to work with*. Once various adjacent majority-minority populations had been carved away from it by the use of race as a proxy to enhance the electoral chances of neighboring incumbents, the core of District 30 was substantially too small to form an entire district. The principal question faced by the redistricters was, therefore, what territory to add to the core out of the remainder of the Dallas area, which remainder has an average African-American population substantially below the 21% county average. In answering that question, as the District Court explained and the maps bear witness, the redistricters created bizarre, far-reaching tentacles that intricately and consistently maximize the available remaining African-American population.

as a proxy to protect the political fortunes of adjacent incumbents, and for its own sake in maximizing the minority population of District 30 regardless of traditional districting principles. District 30's combination of a bizarre, noncompact shape and overwhelming evidence that that shape was essentially dictated by racial considerations of one form or another is exceptional; Texas Congressional District 6, for example, which JUSTICE STEVENS discusses in detail, *post*, at 1019–1020, has only the former characteristic. That combination of characteristics leads us to conclude that District 30 is subject to strict scrutiny.

B

In Harris County, centered on the city of Houston, Districts 18 and 29 interlock "like a jigsaw puzzle . . . in which it might be impossible to get the pieces apart." Barone & Ujifusa, Almanac of American Politics 1996, at 1307–1308; see also Appendixes B and C to this opinion (outlines of Districts 18, 29). As the District Court noted: "[T]hese districts are so finely 'crafted' that one *cannot* visualize their exact boundaries without looking at a map at least three feet square." 861 F. Supp., at 1323. According to the leading statistical study of relative district compactness and regularity, they are two of the three least regular districts in the country. See Pildes & Niemi, 92 Mich. L. Rev., at 565.

District 18's population is 51% African-American and 15% Hispanic. App. 110. It "has some of the most irregular boundaries of any congressional district in the country[,] . . . boundaries that squiggle north toward Intercontinental Airport and northwest out radial highways, then spurt south on one side toward the port and on the other toward the Astrodome." Barone & Ujifusa, *supra*, at 1307. Its "many narrow corridors, wings, or fingers . . . reach out to enclose black voters, while excluding nearby Hispanic residents." Pildes & Niemi, *supra*, at 556.

District 29 has a 61% Hispanic and 10% African-American population. App. 110. It resembles

"'a sacred Mayan bird, with its body running eastward along the Ship Channel from downtown Houston until the tail terminates in Baytown. Spindly legs reach south to Hobby Airport, while the plumed head rises northward almost to Intercontinental. In the western extremity of the district, an open beak appears to be searching for worms in Spring Branch. Here and there, ruffled feathers jut out at odd angles.'" Barone & Ujifusa, *supra*, at 1335.

Not only are the shapes of the districts bizarre; they also exhibit utter disregard of city limits, local election precincts, and voter tabulation district lines. See, *e. g.*, 861 F. Supp., at 1340 (60% of District 18 and District 29 residents live in split precincts). This caused a severe disruption of traditional forms of political activity. Campaigners seeking to visit their constituents "had to carry a map to identify the district lines, because so often the borders would move from block to block"; voters "did not know the candidates running for office" because they did not know which district they lived in. *Ibid.* In light of Texas' requirement that voting be arranged by precinct, with each precinct representing a community that shares local, state, and federal representatives, it also created administrative headaches for local election officials:

"The effect of splitting dozens of [voter tabulation districts] to create Districts 18 and 29 was an electoral nightmare. Harris County estimated that it must increase its number of precincts from 672 to 1,225 to accommodate the new Congressional boundaries. Polling places, ballot forms, and the number of election employees are correspondingly multiplied. Voters were thrust into new and unfamiliar precinct alignments, a few with populations as low as 20 voters." *Id.*, at 1325.

See also App. 119–127 (letter from local official setting forth administrative problems and conflict with local districting

traditions); *id.*, at 147 (map showing splitting of city limits); *id.*, at 128, Plaintiffs' Exh. 6E1, Attachment A (map illustrating splitting of voting precincts).

As with District 30, appellants adduced evidence that incumbency protection played a role in determining the bizarre district lines. The District Court found that one constraint on the shape of District 29 was the rival ambitions of its two "functional incumbents," who distorted its boundaries in an effort to include larger areas of their existing state legislative constituencies. 861 F. Supp., at 1340. But the District Court's findings amply demonstrate that such influences were overwhelmed in the determination of the districts' bizarre shapes by the State's efforts to maximize racial divisions. The State's VRA § 5 submission explains that the bizarre configuration of Districts 18 and 29 "result[s] in the maximization of minority voting strength" in Harris County, App. 110, corroborating the District Court's finding that "[i]n the earliest stages of the Congressional redistricting process, state Democratic and Republican leaders rallied behind the idea of creating a new Hispanic safe seat in Harris County while preserving the safe African-American seat in District 18." 861 F. Supp., at 1324. State officials testified that "it was particularly necessary to split [voter tabulation districts] in order to capture pockets of Hispanic residents" for District 29, and that a 61% Hispanic population in that district—not a mere majority—was insisted upon. *Id.*, at 1340–1341. The record evidence of the racial demographics and voting patterns of Harris County residents belies any suggestion that party politics could explain the dividing lines between the two districts: The district lines correlate almost perfectly with race, see App. 151–152, while both districts are similarly solidly Democratic, see *id.*, at 194. And, even more than in District 30, the intricacy of the lines drawn, separating Hispanic voters from African-American voters on a block-by-block basis, betrays the critical impact of the block-by-block racial data available on the REDAPPL program. The Dis-

trict Court's conclusion is, therefore, inescapable: "Because Districts 18 and 29 are formed in utter disregard for traditional redistricting criteria and because their shapes are ultimately unexplainable on grounds other than the racial quotas established for those districts, they are the product of [presumptively] unconstitutional racial gerrymandering." 861 F. Supp., at 1341.

### III

Having concluded that strict scrutiny applies, we must determine whether the racial classifications embodied in any of the three districts are narrowly tailored to further a compelling state interest. Appellants point to three compelling interests: the interest in avoiding liability under the "results" test of VRA § 2(b), the interest in remedying past and present racial discrimination, and the "nonretrogression" principle of VRA § 5 (for District 18 only). We consider them in turn.

### A

Section 2(a) of the VRA prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." In 1982, Congress amended the VRA by changing the language of § 2(a) and adding § 2(b), which provides a "results" test for violation of § 2(a). A violation exists if,

> "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

Appellants contend that creation of each of the three majority-minority districts at issue was justified by Texas' compelling state interest in complying with this results test.

As we have done in each of our previous cases in which this argument has been raised as a defense to charges of racial gerrymandering, we assume without deciding that compliance with the results test, as interpreted by our precedents, see, *e. g., Growe* v. *Emison*, 507 U. S. 25, 37–42 (1993), can be a compelling state interest. See *Shaw II, ante,* at 915; *Miller*, 515 U. S., at 920–921. We also reaffirm that the "narrow tailoring" requirement of strict scrutiny allows the States a limited degree of leeway in furthering such interests. If the State has a "strong basis in evidence," *Shaw I*, 509 U. S., at 656 (internal quotation marks omitted), for concluding that creation of a majority-minority district is reasonably necessary to comply with § 2, and the districting that is based on race "substantially addresses the § 2 violation," *Shaw II, ante,* at 918, it satisfies strict scrutiny. We thus reject, as impossibly stringent, the District Court's view of the narrow tailoring requirement, that "a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria." 861 F. Supp., at 1343. Cf. *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 291 (1986) (O'CONNOR, J., concurring in part and concurring in judgment) (state actors should not be "trapped between the competing hazards of liability" by the imposition of unattainable requirements under the rubric of strict scrutiny).

A § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless "beauty contests." The dissenters misread us when they make the leap from our disagreement about the facts of this

suit to the conclusion that we are creating a "stalemate" by requiring the States to "get things just right," *post*, at 1063 (SOUTER, J., dissenting), or to draw "the precise compact district that a court would impose in a successful § 2 challenge," *post*, at 1035 (STEVENS, J., dissenting); see also *Shaw II, ante*, at 949 (STEVENS, J., dissenting). Rather, we adhere to our longstanding recognition of the importance in our federal system of each State's sovereign interest in implementing its redistricting plan. See *Voinovich* v. *Quilter*, 507 U. S. 146, 156 (1993) ("[I]t is the domain of the States, and not the federal courts, to conduct apportionment in the first place"); *Miller, supra*, at 915 ("It is well settled that reapportionment is primarily the duty and responsibility of the State") (internal quotation marks omitted). Under our cases, the States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability. And nothing that we say today should be read as limiting "a State's discretion to apply traditional districting principles," *post*, at 1046 (SOUTER, J., dissenting), in majority-minority, as in other, districts. The constitutional problem arises only from the subordination of those principles to race.

Strict scrutiny remains, nonetheless, strict. The State must have a "strong basis in evidence" for finding that the threshold conditions for § 2 liability are present:

> "first, 'that [the minority group] is sufficiently large and *geographically compact* to constitute a majority in a single member district'; second, 'that it is politically cohesive'; and third, 'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Growe, supra*, at 40 (emphasis added) (quoting *Thornburg* v. *Gingles*, 478 U. S. 30, 50–51 (1986)).

And, as we have noted above, the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is "reasonably necessary" to avoid § 2 liability. Districts 18, 29, and 30 fail to meet these requirements.

We assume, without deciding, that the State had a "strong basis in evidence" for finding the second and third threshold conditions for § 2 liability to be present. We have, however, already found that all three districts are bizarrely shaped and far from compact, and that those characteristics are predominantly attributable to gerrymandering that was racially motivated and/or achieved by the use of race as a proxy. See Part II, *supra.* District 30, for example, reaches out to grab small and apparently isolated minority communities which, based on the evidence presented, could not possibly form part of a compact majority-minority district, and does so in order to make up for minority populations closer to its core that it shed in a further suspect use of race as a proxy to further neighboring incumbents' interests. See *supra,* at 965–966, 969–973.

These characteristics defeat any claim that the districts are narrowly tailored to serve the State's interest in avoiding liability under § 2, because § 2 does not require a State to create, on predominantly racial lines, a district that is not "reasonably compact." See *Johnson* v. *De Grandy,* 512 U. S. 997, 1008 (1994). If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district; if a reasonably compact district can be created, nothing in § 2 requires the race-based creation of a district that is far from compact.

Appellants argue that bizarre shaping and noncompactness do not raise narrow tailoring concerns. Appellants Lawson et al. claim that under *Shaw I* and *Miller,* "[s]hape is relevant only as evidence of an improper motive."

Brief for Appellants Lawson et al. 56. They rely on our statement in *Miller:*

> "Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." 515 U. S., at 913.

The United States takes a more moderate position, accepting that in the context of narrow tailoring, "consideration must be given to the extent to which the districts drawn by a State substantially depart from its customary redistricting practices," Brief for United States 36, but asserting that insofar as bizarreness and noncompactness are necessary to achieve the State's compelling interest in compliance with § 2 "while simultaneously achieving other legitimate redistricting goals," *id.,* at 37, such as incumbency protection, the narrowly tailoring requirement is satisfied. Similarly, JUSTICE STEVENS' dissent argues that "noncompact districts should . . . be a permissible method of avoiding violations of [§ 2]." *Post,* at 1034.

These arguments cannot save the districts before us. The Lawson appellants misinterpret *Miller:* District shape is not irrelevant to the narrow tailoring inquiry. Our discussion in *Miller* served only to emphasize that the ultimate constitutional values at stake involve the harms caused by the use of unjustified racial classifications, and that bizarreness is not necessary to trigger strict scrutiny. See *Miller,* 515 U. S., at 912–913. Significant deviations from traditional districting principles, such as the bizarre shape and noncompactness demonstrated by the districts here, cause constitutional harm insofar as they convey the message that political identity is, or should be, predominantly racial. For example, the bizarre shaping of Districts 18 and 29, cutting across pre-

existing precinct lines and other natural or traditional divisions, is not merely evidentially significant; it is part of the constitutional problem insofar as it disrupts nonracial bases of political identity and thus intensifies the emphasis on race.

Nor is the United States' argument availing here. In determining that strict scrutiny applies here, we agreed with the District Court that in fact the bizarre shaping and non-compactness of these districts were predominantly attributable to racial, not political, manipulation. The United States' argument, and that of the dissent, *post*, at 1033–1035 (STEVENS, J., dissenting), address the case of an otherwise compact majority-minority district that is misshapen by predominantly nonracial, political manipulation. See also *post*, at 1068 (SOUTER, J., dissenting) (raising "the possibility that a State could create a majority-minority district that does not coincide with the *Gingles* shape so long as racial data are not overused"). We disagree with the factual premise of JUSTICE STEVENS' dissent, that these districts were drawn using "racial considerations only in a way reasonably designed" to avoid a § 2 violation, *post*, at 1035. The districts before us exhibit a level of racial manipulation that exceeds what § 2 could justify.

### B

The United States and the State next contend that the district lines at issue are justified by the State's compelling interest in "ameliorating the effects of racially polarized voting attributable to past and present racial discrimination." Brief for United States 32; Brief for Appellants Bush et al. 24–25. In support of that contention, they cite Texas' long history of discrimination against minorities in electoral processes, stretching from the Reconstruction to modern times, including violations of the Constitution and of the VRA. See, *e. g., Williams* v. *Dallas*, 734 F. Supp. 1317 (ND Tex. 1990); *White* v. *Regester*, 412 U. S. 755 (1973); *Terry* v. *Adams*, 345 U. S. 461 (1953); *Smith* v. *Allwright*, 321 U. S. 649 (1944); *Nixon* v. *Condon*, 286 U. S. 73 (1932); *Nixon* v.

*Herndon,* 273 U. S. 536 (1927); see also 861 F. Supp., at 1317 (because of its history of official discrimination, Texas became a covered jurisdiction under VRA § 5 in 1975, and the Department of Justice has since "frequently interposed objections against the State and its subdivisions"). Appellants attempt to link that history to evidence that in recent elections in majority-minority districts, "Anglos usually bloc voted against" Hispanic and African-American candidates. *Ibid.*

A State's interest in remedying discrimination is compelling when two conditions are satisfied. First, the discrimination that the State seeks to remedy must be specific, "identified discrimination"; second, the State "must have had a 'strong basis in evidence' to conclude that remedial action was necessary, '*before* it embarks on an affirmative action program.'" *Shaw II, ante,* at 910 (citations omitted). Here, the only current problem that appellants cite as in need of remediation is alleged vote dilution as a consequence of racial bloc voting, the same concern that underlies their VRA § 2 compliance defense, which we have assumed to be valid for purposes of this opinion. We have indicated that such problems will not justify race-based districting unless "the State employ[s] sound districting principles, and . . . the affected racial group's residential patterns afford the opportunity of creating districts in which they will be in the majority." *Shaw I,* 509 U. S., at 657 (internal quotation marks omitted). Once that standard is applied, our agreement with the District Court's finding that these districts are not narrowly tailored to comply with § 2 forecloses this line of defense.

## C

The final contention offered by the State and private appellants is that creation of District 18 (only) was justified by a compelling state interest in complying with VRA § 5. We have made clear that § 5 has a limited substantive goal: "'to insure that no voting-procedure changes would be made that

would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" *Miller,* 515 U. S., at 926 (quoting *Beer* v. *United States,* 425 U. S. 130, 141 (1976)). Appellants contend that this "nonretrogression" principle is implicated because Harris County had, for two decades, contained a congressional district in which African-American voters had succeeded in selecting representatives of their choice, all of whom were African-Americans.

The problem with the State's argument is that it seeks to justify not maintenance, but substantial augmentation, of the African-American population percentage in District 18. At the previous redistricting, in 1980, District 18's population was 40.8% African-American. Plaintiffs' Exh. 13B, p. 55. As a result of Hispanic population increases and African-American emigration from the district, its population had reached 35.1% African-American and 42.2% Hispanic at the time of the 1990 census. The State has shown no basis for concluding that the *increase* to a 50.9% African-American population in 1991 was necessary to ensure nonretrogression. Nonretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral *success;* it merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions. We anticipated this problem in *Shaw I,* 509 U. S., at 655: "A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." Applying that principle, it is clear that District 18 is not narrowly tailored to the avoidance of § 5 liability.

## IV

The dissents make several further arguments against today's decision, none of which address the specifics of this case. We have responded to these points previously. JUSTICE SOUTER, for example, reiterates his contention from

*Shaw I* that because districts created with a view to satisfying § 2 do not involve "racial subjugation," *post*, at 1055, and may in a sense be "'benign[ly]'" motivated, *Shaw I*, 509 U. S., at 685 (SOUTER, J., dissenting), strict scrutiny should not apply to them. We rejected that argument in *Shaw I*, and we reject it now. As we explained then, see *id.*, at 653, we subject racial classifications to strict scrutiny precisely because that scrutiny is necessary to determine whether they are benign—as JUSTICE STEVENS' hypothetical of a targeted outreach program to protect victims of sickle cell anemia, see *post*, at 1032, would, no doubt, be—or whether they misuse race and foster harmful and divisive stereotypes without a compelling justification. We see no need to revisit our prior debates.

Both dissents contend that the recognition of the *Shaw I* cause of action threatens public respect for, and the independence of, the Federal Judiciary by inserting the courts deep into the districting process. We believe that the dissents both exaggerate the dangers involved, and fail to recognize the implications of their suggested retreat from *Shaw I.*

As to the dangers of judicial entanglement, JUSTICE STEVENS' dissent makes much of cases stemming from state districting plans originally drawn up before *Shaw I*, in which problems have arisen from the uncertainty in the law prior to and during its gradual clarification in *Shaw I*, *Miller*, and today's cases. See *post*, at 1037–1038 (STEVENS, J., dissenting). We are aware of the difficulties faced by the States, and by the district courts, in confronting new constitutional precedents, and we also know that the nature of the expressive harms with which we are dealing, and the complexity of the districting process, are such that bright-line rules are not available. But we believe that today's decisions, which both illustrate the defects that offend the principles of *Shaw I* and reemphasize the importance of the States' discretion in the redistricting process, see *supra*, at 978–979, will serve

to clarify the States' responsibilities. The States have traditionally guarded their sovereign districting prerogatives jealously, and we are confident that they can fulfill that requirement, leaving the courts to their customary and appropriate backstop role.

This Court has now rendered decisions after plenary consideration in five cases applying the *Shaw I* doctrine (*Shaw I, Miller, Hays, Shaw II,* and this suit). The dissenters would have us abandon those precedents, suggesting that fundamental concerns relating to the judicial role are at stake. See *post,* at 1035, 1038, 1041 (STEVENS, J., dissenting); *post,* at 1047, and n. 2, 1052, 1064, 1074, 1076–1077 (SOUTER, J., dissenting); *Shaw II, ante,* at 919–920, 922–923, and n. 3, 929 (STEVENS, J., dissenting); but see *ante,* at 932–933 (noting that the judicial task of distinguishing race-based from non-race-based action in *Shaw I* cases is far from unique). While we agree that those concerns are implicated here, we believe they point the other way. Our legitimacy requires, above all, that we adhere to *stare decisis,* especially in such sensitive political contexts as the present, where partisan controversy abounds. Legislators and district courts nationwide have modified their practices—or, rather, reembraced the traditional districting practices that were almost universally followed before the 1990 census—in response to *Shaw I.* Those practices and our precedents, which acknowledge voters as more than mere racial statistics, play an important role in defining the political identity of the American voter. Our Fourteenth Amendment jurisprudence evinces a commitment to eliminate unnecessary and excessive governmental use and reinforcement of racial stereotypes. See, *e. g., Georgia* v. *McCollum,* 505 U. S. 42, 59 (1992) ("[T]he exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party"); *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 630–631 (1991) ("If our society is to continue to progress as a multiracial democracy, it must recog-

nize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury"); *Powers*, 499 U. S., at 410 ("We may not accept as a defense to racial discrimination the very stereotype the law condemns"); *Holland* v. *Illinois*, 493 U. S. 474, 484, n. 2 (1990) ("[A] prosecutor's 'assumption that a black juror may be presumed to be partial simply because he is black' . . . violates the Equal Protection Clause"); *Batson* v. *Kentucky*, 476 U. S. 79, 104 (1986) ("[T]he Equal Protection Clause prohibits a State from taking any action based on crude, inaccurate racial stereotypes"). We decline to retreat from that commitment today.

*    *    *

The judgment of the District Court is

*Affirmed.*

APPENDIX A TO OPINION OF O'CONNOR, J.

TEXAS CONGRESSIONAL DISTRICT 30

APPENDIX B TO OPINION OF O'CONNOR, J.

TEXAS CONGRESSIONAL DISTRICT 18

APPENDIX C TO OPINION OF O'CONNOR, J.

TEXAS CONGRESSIONAL DISTRICT 29

JUSTICE O'CONNOR, concurring.

I write separately to express my view on two points. First, compliance with the results test of §2 of the Voting Rights Act (VRA) is a compelling state interest. Second, that test can coexist in principle and in practice with *Shaw* v. *Reno*, 509 U. S. 630 (1993), and its progeny, as elaborated in today's opinions.

I

As stated in the plurality opinion, *ante*, at 977 (O'CONNOR, J., joined by REHNQUIST, C. J., and KENNEDY, J.), this Court has thus far assumed without deciding that compliance with the results test of VRA §2(b) is a compelling state interest. See *Shaw* v. *Hunt, ante*, at 915 *(Shaw II); Miller* v. *Johnson*, 515 U. S. 900, 920–921 (1995). Although that assumption is not determinative of the Court's decisions today, I believe that States and lower courts are entitled to more definite guidance as they toil with the twin demands of the Fourteenth Amendment and the VRA.

The results test is violated if,

> "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [*e. g.*, a racial minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. §1973(b).

In the 14 years since the enactment of §2(b), we have interpreted and enforced the obligations that it places on States in a succession of cases, assuming but never directly addressing its constitutionality. See *Johnson* v. *De Grandy*, 512 U. S. 997 (1994); *Holder* v. *Hall*, 512 U. S. 874 (1994); *Voinovich* v. *Quilter*, 507 U. S. 146 (1993); *Growe* v. *Emison*, 507 U. S. 25, 37–42 (1993); *Chisom* v. *Roemer*, 501 U. S. 380 (1991); *Thornburg* v. *Gingles*, 478 U. S. 30 (1986); cf. *Chisom*,

*supra,* at 418 (KENNEDY, J., dissenting) (noting that a constitutional challenge to the statute was not before the Court). Meanwhile, lower courts have unanimously affirmed its constitutionality. See *United States* v. *Marengo County Comm'n,* 731 F. 2d 1546, 1556–1563 (CA11), cert. denied, 469 U. S. 976 (1984); *Jones* v. *Lubbock,* 727 F. 2d 364, 372–375 (CA5 1984); *Shaw* v. *Hunt,* 861 F. Supp. 408, 438 (EDNC 1994), aff'd, *Shaw II, ante,* p. 899; *Prosser* v. *Elections Bd.,* 793 F. Supp. 859, 869 (WD Wis. 1992); *Wesley* v. *Collins,* 605 F. Supp. 802, 808 (MD Tenn. 1985), aff'd, 791 F. 2d 1255 (CA6 1986); *Jordan* v. *Winter,* 604 F. Supp. 807, 811 (ND Miss.), aff'd *sub nom. Allain* v. *Brooks,* 469 U. S. 1002 (1984); *Sierra* v. *El Paso Independent School Dist.,* 591 F. Supp. 802, 806 (WD Tex. 1984); *Major* v. *Treen,* 574 F. Supp. 325, 342–349 (ED La. 1983); accord, Hartman, Racial Vote Dilution and Separation of Powers: An Exploration of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards, 50 Geo. Wash. L. Rev. 689, 739–752 (1982). Cf. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966) (upholding the original VRA as a valid exercise of Congress' power under § 2 of the Fifteenth Amendment); *Fullilove* v. *Klutznick,* 448 U. S. 448, 477 (1980) (*Katzenbach* and its successors interpreting § 2 of the Fifteenth Amendment "confirm that congressional authority extends beyond the prohibition of purposeful discrimination to encompass state action that has discriminatory impact perpetuating the effects of past discrimination"); *White* v. *Alabama,* 867 F. Supp. 1519, 1549 (MD Ala. 1994) (the results test "has not been held unconstitutional and complying with it remains a strong state interest"), vacated and remanded on other grounds, 74 F. 3d 1058, 1069 (CA11 1996) (noting that "Section 2 was enacted to enforce the Fifteenth Amendment's prohibition against denying a citizen the right to vote 'on account of race' ").

Against this background, it would be irresponsible for a State to disregard the § 2 results test. The Supremacy Clause obliges the States to comply with all constitutional

exercises of Congress' power. See U. S. Const., Art. VI, cl. 2. Statutes are presumed constitutional, see, *e. g., Fairbank* v. *United States*, 181 U. S. 283, 285 (1901), and that presumption appears strong here in light of the weight of authority affirming the results test's constitutionality. In addition, fundamental concerns of federalism mandate that States be given some leeway so that they are not "trapped between the competing hazards of liability." *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 291 (1986) (O'CONNOR, J., concurring). We should allow States to assume the constitutionality of § 2 of the VRA, including the 1982 amendments.

This conclusion is bolstered by concerns of respect for the authority of Congress under the Reconstruction Amendments. See *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980). The results test of § 2 is an important part of the apparatus chosen by Congress to effectuate this Nation's commitment "to confront its conscience and fulfill the guarantee of the Constitution" with respect to equality in voting. S. Rep. No. 97–417, p. 4 (1982). Congress considered the test "necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights." *Id.*, at 27. It believed that without the results test, nothing could be done about "overwhelming evidence of unequal access to the electoral system," *id.*, at 26, or about "voting practices and procedures [that] perpetuate the effects of past purposeful discrimination," *id.*, at 40. And it founded those beliefs on the sad reality that "there still are some communities in our Nation where racial politics do dominate the electoral process." *Id.*, at 33. Respect for those legislative conclusions mandates that the § 2 results test be accepted and applied unless and until current lower court precedent is reversed and it is held unconstitutional.

In my view, therefore, the States have a compelling interest in complying with the results test as this Court has interpreted it.

## II

Although I agree with the dissenters about §2's role as part of our national commitment to racial equality, I differ from them in my belief that that commitment can and must be reconciled with the complementary commitment of our Fourteenth Amendment jurisprudence to eliminate the unjustified use of racial stereotypes. At the same time that we combat the symptoms of racial polarization in politics, we must strive to eliminate unnecessary race-based state action that appears to endorse the disease.

Today's decisions, in conjunction with the recognition of the compelling state interest in compliance with the reasonably perceived requirements of §2, present a workable framework for the achievement of these twin goals. I would summarize that framework, and the rules governing the States' consideration of race in the districting process, as follows.

First, so long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny. See *ante*, at 958–959 (plurality opinion); *post*, at 1008–1011, and n. 8, 1025 (STEVENS, J., dissenting); *post*, at 1056, 1065, 1073 (SOUTER, J., dissenting). Only if traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race does strict scrutiny apply. *Ante*, at 962, 964, 978 (plurality opinion).

Second, where voting is racially polarized, §2 prohibits States from adopting districting schemes that would have the effect that minority voters "have less opportunity than other members of the electorate to . . . elect representatives of their choice." §2(b). That principle may require a State to create a majority-minority district where the three *Gingles* factors are present—viz., (i) the minority group "is sufficiently large and geographically compact to constitute a

majority in a single-member district," (ii) "it is politically cohesive," and (iii) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate," *Thornburg* v. *Gingles*, 478 U. S., at 50–51.

Third, the state interest in avoiding liability under VRA § 2 is compelling. See *supra*, at 990–992; *post*, at 1033 (STEVENS, J., dissenting); *post*, at 1065 (SOUTER, J., dissenting). If a State has a strong basis in evidence for concluding that the *Gingles* factors are present, it may create a majority-minority district without awaiting judicial findings. Its "strong basis in evidence" need not take any particular form, although it cannot simply rely on generalized assumptions about the prevalence of racial bloc voting.

Fourth, if a State pursues that compelling interest by creating a district that "substantially addresses" the potential liability, *Shaw II, ante,* at 918, and does not deviate substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons, cf. *ante,* at 979 (plurality opinion) (explaining how District 30 fails to satisfy these criteria), its districting plan will be deemed narrowly tailored. Cf. *ante,* at 981 (plurality opinion) (acknowledging this possibility); *post,* at 1068 (SOUTER, J., dissenting) (same); *post,* at 1033–1035 (STEVENS, J., dissenting) (contending that it is applicable here).

Finally, however, districts that are bizarrely shaped and noncompact, and that otherwise neglect traditional districting principles and deviate substantially from the hypothetical court-drawn district, *for predominantly racial reasons,* are unconstitutional. See *ante,* at 979 (plurality opinion).

District 30 illustrates the application of these principles. Dallas County has a history of racially polarized voting. See, *e. g., White* v. *Regester,* 412 U. S. 755, 765–767 (1973); *Lipscomb* v. *Wise,* 399 F. Supp. 782, 785–786 (ND Tex. 1975), rev'd, 551 F. 2d 1043 (CA5 1977), rev'd, 437 U. S. 535 (1978). One year before the redistricting at issue here, a District Court invalidated under § 2 the Dallas City Council election

scheme, finding racial polarization and that candidates preferred by African-American voters were consistently defeated. See *Williams* v. *Dallas,* 734 F. Supp. 1317, 1387–1394 (ND Tex. 1990). Expert testimony in this litigation also confirmed the existence of racially polarized voting in and around Dallas County. 4 Tr. 187; see also App. 227. With respect to geographical compactness, the record contains two quite different possible designs for District 30, the original Johnson Plan, *id.,* at 139, and the Owens-Pate Plan, *id.,* at 141, that are reasonably compact and include, respectively, 44% and 45.6% African-American populations. This evidence provided a strong basis for Texas' belief that the creation of a majority-minority district was appropriate. But Texas allowed race to dominate the drawing of District 30 to the almost total exclusion of nonracial districting considerations, and ultimately produced a district that, because of the misuse of race as a proxy in addition to legitimate efforts to satisfy §2, is bizarrely shaped and far from compact. See *ante,* at 965–966, 969–973, and n. (plurality opinion); compare *post,* at 1014–1032 (STEVENS, J., dissenting). It thus came under strict scrutiny and failed the narrow tailoring test.

As the disagreement among Members of this Court over District 30 shows, the application of the principles that I have outlined sometimes requires difficult exercises of judgment. That difficulty is inevitable. The VRA requires the States and the courts to take action to remedy the reality of racial inequality in our political system, sometimes necessitating race-based action, while the Fourteenth Amendment requires us to look with suspicion on the excessive use of racial considerations by the government. But I believe that the States, playing a primary role, and the courts, in their secondary role, are capable of distinguishing the appropriate and reasonably necessary uses of race from its unjustified and excessive uses.

JUSTICE KENNEDY, concurring.

I join the plurality opinion, but the statements in Part II of the opinion that strict scrutiny would not apply to all cases of intentional creation of majority-minority districts, *ante*, at 958, 962–963, require comment. Those statements are unnecessary to our decision, for strict scrutiny applies here. I do not consider these dicta to commit me to any position on the question whether race is predominant whenever a State, in redistricting, foreordains that one race be the majority in a certain number of districts or in a certain part of the State. In my view, we would no doubt apply strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races.

We need not answer this question here, for there is ample evidence that otherwise demonstrates the predominance of race in Texas' redistricting, as the plurality shows, *ante*, at 958–976. And this question was not at issue in *DeWitt* v. *Wilson*, 856 F. Supp. 1409 (ED Cal. 1994), summarily aff'd in part and dism'd in part, 515 U. S. 1170 (1995). (I note that our summary affirmance in *DeWitt* stands for no proposition other than that the districts reviewed there were constitutional. We do not endorse the reasoning of the district court when we order summary affirmance of the judgment. *Mandel* v. *Bradley*, 432 U. S. 173, 176 (1977) *(per curiam); Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974).)

On the narrow-tailoring issue, I agree that the districts challenged here were not reasonably necessary to serve the assumed compelling state interest in complying with § 2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973. As the plurality opinion indicates, *ante*, at 978, in order for compliance with § 2 to be a compelling interest, the State must have a strong basis in the evidence for believing that all three of the threshold conditions for a § 2 claim are met:

> "[F]irst, 'that [the minority group] is sufficiently large and geographically compact to constitute a majority in

a single-member district'; second, 'that it is politically cohesive'; and third, 'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'" *Growe* v. *Emison,* 507 U. S. 25, 40 (1993), quoting *Thornburg* v. *Gingles,* 478 U. S. 30, 50–51 (1986).

The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district. As the plurality observes: "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district . . . ." *Ante,* at 979. We may assume, as the plurality does expressly, *ibid.,* that there was sufficient evidence of racial polarization to fulfill the second and third *Gingles* conditions, and we may assume, as must be done to reach the narrow-tailoring question, that the African-American and Hispanic populations in Harris County and the African-American population in Dallas County were each concentrated enough to form a majority in a reasonably compact district, thereby meeting the first *Gingles* condition.

If a State has the assumed compelling interest in avoiding § 2 liability, it still must tailor its districts narrowly to serve that interest. "[T]he districting that is based on race [must] 'substantially addres[s] the § 2 violation.'" *Ante,* at 977 (quoting *Shaw* v. *Hunt, ante,* at 918 *(Shaw II)).* The State may not engage in districting based on race except as reasonably necessary to cure the anticipated § 2 violation, nor may it use race as a proxy to serve other interests. *Ante,* at 979. The plurality gives as an example of the former the fact that "District 30 . . . reaches out to grab small and apparently isolated minority communities which, based on the evidence presented, could not possibly form part of a compact majority-minority district." *Ibid.* (referring to tentacles of District 30 that coil around outlying African-American communities in Collin and Tarrant Counties, *ante,* at 965–

966). And, as the plurality further holds in a portion of its predominant-factor analysis that is central to the narrow-tailoring inquiry, District 30 also involved the illicit use of race as a proxy when legislators shifted blocs of African-American voters to districts of incumbent Democrats in order to promote partisan interests. See *ante*, at 968–970.

Narrow tailoring is absent in Districts 18 and 29 as well. Although the State could have drawn either a majority-African-American or majority-Hispanic district in Harris County without difficulty, there is no evidence that two reasonably compact majority-minority districts could have been drawn there. Of the major alternative plans considered below, only the Owens-Pate plan drew majority-African-American and majority-Hispanic districts in Harris County, App. 142, but those districts were not compact. Section 2 does not require the State to create two noncompact majority-minority districts just because a compact district could be drawn for either minority independently. See *ante*, at 979 ("§ 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact'"); *Johnson* v. *De Grandy*, 512 U. S. 997, 1024 (1994) (affirming, upon a finding of no vote dilution, District Court decision not to give § 2 remedies to both African-Americans and Hispanics because population overlap made the remedies mutually exclusive). The race-based districting that the State performed in drawing Districts 18, 29, and 30 was not justified by § 2, or indeed by any other compelling interest, either real or assumed. That itself suffices to defeat the State's claim that those three districts were narrowly tailored. *Shaw II, ante,* at 915–918. (In this respect, I disagree with the apparent suggestion in JUSTICE O'CONNOR's separate concurrence that a court should conduct a second predominant-factor inquiry in deciding whether a district was narrowly tailored, see *ante,* at 994. There is nothing in

the plurality opinion or any opinion of the Court to support that proposition. The simple question is whether the race-based districting was reasonably necessary to serve a compelling interest.)

While § 2 does not require a noncompact majority-minority district, neither does it forbid it, provided that the rationale for creating it is proper in the first instance. Districts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one. States are not prevented from taking into account race-neutral factors in drawing permissible majority-minority districts. If, however, the bizarre shape of the district is attributable to race-based districting unjustified by a compelling interest (*e. g.*, gratuitous race-based districting or use of race as a proxy for other interests), such districts may "cause constitutional harm insofar as they convey the message that political identity is, or should be, predominantly racial," *ante*, at 980. While districts "may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests,'" *ante*, at 977, the District Court was right to declare unconstitutional the egregious, unjustified race-based districting that occurred here.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment.

In my view, application of strict scrutiny in this suit was never a close question. I cannot agree with JUSTICE O'CONNOR's assertion that strict scrutiny is not invoked by the intentional creation of majority-minority districts. See *ante*, at 958. Though *Shaw* v. *Reno*, 509 U. S. 630, 649 (1993) *(Shaw I)*, expressly reserved that question, we effectively resolved it in subsequent cases. Only last Term, in *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995), we vigorously asserted that all governmental racial classifica-

tions must be strictly scrutinized.[1]   And in *Miller* v. *Johnson*, 515 U. S. 900 (1995), Georgia's concession that it intentionally created majority-minority districts was sufficient to show that race was a predominant, motivating factor in its redistricting.   *Id.*, at 918–919.

Strict scrutiny applies to all governmental classifications based on race, and we have expressly held that there is no exception for race-based redistricting.   *Id.*, at 913–915; *Shaw I*, *supra*, at 643–647.   While we have recognized the evidentiary difficulty of proving that a redistricting plan is, in fact, a racial gerrymander, see *Miller, supra*, at 916–917; *Shaw I*, 509 U. S., at 646–647, we have never suggested that a racial gerrymander is subject to anything less than strict scrutiny.   See *id.*, at 646 ("The difficulty of proof, of course, does not mean that a racial gerrymander, once established, should receive less scrutiny under the Equal Protection Clause than other state legislation classifying citizens by race").

In *Shaw I*, we noted that proving a racial gerrymander "sometimes will not be difficult at all," *ibid.*, and suggested that evidence of a highly irregular shape or disregard for traditional race-neutral districting principles could suffice to invoke strict scrutiny.   We clarified in *Miller* that a plaintiff may rely on both circumstantial and direct evidence and said that a plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations."   515 U. S., at 916.   The shape of Georgia's Eleventh District was itself "quite compelling" evidence of

---

[1] In *Adarand*, we overruled *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990), and held that strict scrutiny applies to racial classifications by the Federal Government as well as to those by the States.   For quite some time, however, we have consistently held that race-based classifications by the States must be strictly scrutinized.   See, *e. g.*, *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493–494 (1989) (plurality opinion); *id.*, at 520 (SCALIA, J., concurring in judgment); *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 273 (1986) (plurality opinion); *id.*, at 285 (O'CONNOR, J., concurring in part and concurring in judgment).

a racial gerrymander, but there was other evidence that showed that the legislature was motivated by a "predominant, overriding desire" to create a third majority-black district. That evidence was the State's own concession that the legislature had intentionally created an additional majority-black district. See *id.*, at 918–919. On that record, we found that the District Court could not have "reached any conclusion other than that race was the predominant factor in drawing Georgia's Eleventh District." *Id.*, at 918.

We have said that impermissible racial classifications do not follow inevitably from a legislature's mere awareness of racial demographics. See *id.*, at 916; *Shaw I, supra,* at 646. But the intentional creation of a majority-minority district certainly means more than mere awareness that application of traditional, race-neutral districting principles will result in the creation of a district in which a majority of the district's residents are members of a particular minority group. See *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279 (1979) (distinguishing discriminatory intent from "intent as volition" or "intent as awareness of consequences"). In my view, it means that the legislature affirmatively undertakes to create a majority-minority district that would not have existed but for the express use of racial classifications—in other words, that a majority-minority district is created "because of," and not merely "in spite of," racial demographics. See *ibid.* When that occurs, traditional race-neutral districting principles are necessarily subordinated (and race necessarily predominates), and the legislature has classified persons on the basis of race. The resulting redistricting must be viewed as a racial gerrymander.

Our summary affirmance of *DeWitt* v. *Wilson,* 856 F. Supp. 1409 (ED Cal. 1994), summarily aff'd in part and dism'd in part, 515 U. S. 1170 (1995), cannot justify exempting intentional race-based redistricting from our well-established Fourteenth Amendment standard. "When we summarily

affirm, without opinion, the judgment of a three-judge district court we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." *Fusari* v. *Steinberg*, 419 U. S. 379, 391–392 (1975) (Burger, C. J., concurring) (footnote omitted). I would not read our summary affirmance of *DeWitt* to eviscerate the explicit holding of *Adarand* or to undermine the force of our discussion of Georgia's concessions in *Miller.*

In this suit, Texas readily admits that it intentionally created majority-minority districts and that those districts would not have existed but for its affirmative use of racial demographics. As the State concedes in its brief:

> "Texas intentionally maintained [District] 18 as an African-American opportunity district and intentionally created [Districts] 29 and 30 as minority opportunity districts in order to comply voluntarily with its reasonable belief, based upon strong evidence, that it was required to do so by the Voting Rights Act, and because it desired to insure that minorities who have historically been excluded from the electoral process in Texas had a reasonable opportunity to elect candidates of their choice."
> Brief for State Appellants 25.

See also *ante*, at 959–961, 969–970 (reciting similar concessions by Texas). That is enough to require application of strict scrutiny in this suit.[2] I am content to reaffirm our holding in *Adarand* that all racial classifications by government must be strictly scrutinized and, even in the

---

[2] It is unnecessary to parse in detail the contours of each challenged district. See *ante*, at 965–976. I agree that the geographic evidence is itself sufficient to invoke strict scrutiny, but once the State directly conceded that it intentionally used racial classifications to create majority-minority districts, there was no need to rely on circumstantial evidence.

sensitive area of state legislative redistricting, I would make no exceptions.

I am willing to assume without deciding that the State has asserted a compelling state interest. Given that assumption, I agree that the State's redistricting attempts were not narrowly tailored to achieve its asserted interest. I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

The 1990 census revealed that Texas' population had grown, over the past decade, almost twice as fast as the population of the country as a whole. As a result, Texas was entitled to elect three additional Representatives to the United States Congress, enlarging its delegation from 27 to 30. Because Texas' growth was concentrated in south Texas and the cities of Dallas and Houston, the state legislature concluded that the new congressional districts should be carved out of existing districts in those areas. The consequences of the political battle that produced the new map are some of the most oddly shaped congressional districts in the United States.

Today, the Court strikes down three of Texas' majority-minority districts, concluding, *inter alia,* that their odd shapes reveal that the State impermissibly relied on predominantly racial reasons when it drew the districts as it did. For two reasons, I believe that the Court errs in striking down those districts.

First, I believe that the Court has misapplied its own tests for racial gerrymandering, both by applying strict scrutiny to all three of these districts, and then by concluding that none can meet that scrutiny. In asking whether strict scrutiny should apply, the Court improperly ignores the "complex interplay" of political and geographical considerations that went into the creation of Texas' new congressional districts, *Miller* v. *Johnson,* 515 U. S. 900, 915–916 (1995), and

focuses exclusively on the role that race played in the State's decisions to adjust the shape of its districts. A quick comparison of the unconstitutional majority-minority districts with three equally bizarre majority-Anglo districts, compare *ante,* at Appendixes A–C, with *infra,* at Appendixes A–C, demonstrates that race was not necessarily the predominant factor contorting the district lines. I would follow the fair implications of the District Court's findings,[1] and conclude that Texas' entire map is a political, not a racial, gerrymander.[2] See Part IV, *infra.*

Even if strict scrutiny applies, I would find these districts constitutional, for each considers race only to the extent necessary to comply with the State's responsibilities under the Voting Rights Act while achieving other race-neutral political and geographical requirements. The plurality's finding to the contrary unnecessarily restricts the ability of States to conform their behavior to the Voting Rights Act while simultaneously complying with other race-neutral goals. See Part V, *infra.*

Second, even if I concluded that these districts failed an appropriate application of this still-developing law to appropriately read facts, I would not uphold the District Court decision. The decisions issued today serve merely to rein-

---

[1] The District Court recognized, but erroneously ignored, the overwhelming weight of evidence demonstrating that political considerations dominated the shaping of Texas' congressional districts. See *Vera* v. *Richards,* 861 F. Supp. 1304, 1331, 1334–1336 (SD Tex. 1994); *infra,* at 1027–1029.

[2] Because I believe that political gerrymanders are more objectionable than the "racial gerrymanders" perceived by the Court in recent cases, see *Karcher* v. *Daggett,* 462 U. S. 725, 748 (1983) (STEVENS, J., concurring); *Davis* v. *Bandemer,* 478 U. S. 109, 161–162, 166 (1986) (Powell, J., concurring in part and dissenting in part), I am not entirely unsympathetic to the Court's holding. I believe, however, that the evils of political gerrymandering should be confronted directly, rather than through the race-specific approach that the Court has taken in recent years. See also *infra,* at 1038–1040.

force my conviction that the Court has, with its "analytically distinct" jurisprudence of racial gerrymandering, *Shaw* v. *Reno*, 509 U. S. 630, 652 (1993) *(Shaw I)*, struck out into a jurisprudential wilderness that lacks a definable constitutional core and threatens to create harms more significant than any suffered by the individual plaintiffs challenging these districts. See Parts VI–VII, *infra; Shaw* v. *Hunt*, *ante*, at 918–919 *(Shaw II)* (STEVENS, J., dissenting). Though we travel ever farther from it with each passing decision, I would return to the well-traveled path that we left in *Shaw I*.

## I

The factors motivating Texas' redistricting plan are clearly revealed in the results of the 1992 elections. Both before and immediately after the 1990 census, the Democratic Party was in control of the Texas Legislature. Under the new map in 1992, more than two-thirds of the Districts—including each of the new ones—elected Democrats, even though Texas voters are arguably more likely to vote Republican than Democrat.[3] Incumbents of both parties were just as successful: 26 of the 27 incumbents were reelected, while each of the three new districts elected a state legislator who had essentially acted as an incumbent in the districting process,[4] giving "incumbents" a 97% success rate.

---

[3] In elections since 1980, the State has elected a Democrat in only two of four gubernatorial races, and in only two of six races for the United States Senate. America Votes 21: A Handbook of Contemporary American Election Statistics 417 (R. Scammon & A. McGillivray eds. 1995). Furthermore, in 1994, Republican candidates received a total of 550,000 more votes than Democratic candidates in Texas' 30 races for the United States House of Representatives, *id.*, at 4, while in 1992, Democratic House candidates outpolled Republicans by only 147,000 votes (despite winning 27 of 30 districts). America Votes 20: A Handbook of Contemporary American Election Statistics 474 (R. Scammon & A. McGillivray eds. 1993).

[4] Then-State Senator from Dallas, Eddie Bernice Johnson, who was chair of the Senate Subcommittee on Congressional Districts, maneuvered to construct District 30 in a manner that would ensure her election. 861

It was not easy for the State to achieve these results while simultaneously guaranteeing that each district enclosed the residence of its incumbent, contained the same number of people, and complied with other federal and state districting requirements. Much of Dallas and Houston, for example, was already represented in Congress by Democrats, and creating new Democratic districts in each city while ensuring politically safe seats for sitting Representatives required significant political gerrymandering. This task was aided by technological and informational advances that allowed the State to adjust lines on the scale of city blocks, thereby guaranteeing twists and turns that would have been essentially impossible in any earlier redistricting.[5] "[T]he result of the Legislature's efforts," the District Court concluded, was "a

F. Supp., at 1313; Politics in America 1994: The 103rd Congress 1536 (1993) ("This is the District Eddie Bernice Johnson drew"). Vice chair of the same committee, Frank Tejeda, also "attempted to draw a district [District 28] that would facilitate his potential candidacy." 861 F. Supp., at 1326. And State Senator Gene Green and State Representative Roman Martinez, both Houston-area officials with designs on Congress, competed in an effort to design District 29 in a way that would guarantee their own election. *Id.*, at 1324, n. 27. (Martinez later dropped out of the congressional race to run for State Senate.) Because the role that these legislators played in the redistricting process was largely identical to that played by sitting incumbents, my references to the role of "incumbents" in the redistricting process generally refer to these individuals as well.

[5] As did many other States, Texas kept track of the shapes of its post-1990 districts with a computer districting program loaded with 1990 census information and geographic information at scales ranging from statewide to that of a city block. See generally *Shaw* v. *Hunt*, 861 F. Supp. 408, 457 (EDNC 1994) (describing computer programs); 861 F. Supp., at 1318–1319. The dramatic increase in bizarrely shaped districts after 1990 can be traced, at least in part, to the fact that computers allowed legislators to achieve their political goals geographically in a manner far more precise than heretofore possible. See Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*, 92 Mich. L. Rev. 483, 574 (1993); Note, The Illegitimacy of the Incumbent Gerrymander, 74 Texas L. Rev. 913, 924 (1996).

crazy-quilt of districts" that bore little resemblance to "the work of public-spirited representatives." *Vera* v. *Richards*, 861 F. Supp. 1304, 1309 (SD Tex. 1994); see, *e. g.*, Appendixes A–D.

It is clear that race also played a role in Texas' redistricting decisions. According to the 1990 Census, Texas contained 16,986,510 residents, of whom 22.5% were of Hispanic origin, and 11.6% were non-Hispanic African-American. 861 F. Supp., at 1311. Under the pre-1990 districting scheme, Texas' 27-member delegation included four Hispanics and one African-American. In Harris County, a concentrated Hispanic community was divided among several majority-Anglo districts as well as the majority-minority District 18. In Dallas County, the majority-black community in South Dallas was split down the middle between two majority-Anglo districts. The legislature was well aware, after the 1990 census, that the minority communities in each county were disproportionately responsible for the growth in population that gained three representatives for the State. Given the omnipresence of § 2 of the Voting Rights Act, 42 U. S. C. § 1973, the demographics of the two communities, and the pressure from leaders of the minority communities in those cities, it was not unreasonable—and certainly not invidious discrimination of any sort—for the State to accede to calls for the creation of majority-minority districts in both cities.[6]

---

[6] The State added District 28 (a majority-Hispanic district in south Texas), District 29 (a majority-Hispanic district in Houston), and District 30 (a majority-black district in Dallas). In addition, the State reconfigured Houston's District 18. That district had elected African-American Representatives to Congress since the early 1970's and remained majority-minority in 1990, although a plurality of its population was by then Hispanic. To create District 29, the legislature altered the shape of District 18 to move parts of its Hispanic population into that neighboring district while retaining a majority-black population.

To the extent that the precise shape of these districts relied on race rather than other factors, that racial gerrymandering was somewhat less

While complying with a multitude of other political and legal requirements, then, Texas created three new majority-minority congressional districts and significantly reconfigured one pre-existing district. The District Court concluded that the State impermissibly emphasized race over nonracial factors when it drew two of these new districts (District 30 in Dallas and District 29 in Houston) and the reconfigured District 18 in Houston. To determine whether the Court correctly affirms that decision, I begin, as does the plurality, by asking whether "strict scrutiny" should be applied to the State's consideration of race in the creation of these majority-minority districts.

## II

We have traditionally applied strict scrutiny to state action that discriminates on the basis of race. Prior to *Shaw I*, however, we did so only in cases in which that discrimination harmed an individual or set of individuals because of their race. In contrast, the harm identified in *Shaw I* and its progeny is much more diffuse. See *Shaw II, ante,* at 921–925 (STEVENS, J., dissenting). Racial gerrymandering of the sort being addressed in these cases is "discrimination" only in the sense that the lines are drawn based on race, not in the sense that harm is imposed on specific persons on account of their race. *Ante,* at 923–924 (STEVENS, J., dissenting).

Aware of this distinction, a majority of this Court has endorsed a position crucial to a proper evaluation of Texas' congressional districts: Neither the Equal Protection Clause nor any other provision of the Constitution was offended merely because the legislature considered race when it deliberately

---

effective than the political gerrymandering had been: District 29, created as a majority-Hispanic district, elected an Anglo, former State Senator Green, in 1992, and reelected him in 1994. America Votes 21, at 437. Given his substantial role in crafting the district to meet his electoral needs, see n. 4, *supra,* Green's success suggests the power of incumbency over race.

created three majority-minority districts.[7] The plurality's statement that strict scrutiny "does [not] apply to all cases of intentional creation of majority-minority districts," *ante*, at 958, merely caps a long line of discussions, stretching from *Shaw I* to *Shaw II*, which have both expressly and implicitly set forth precisely that conclusion.[8]

---

[7] I do not agree with the Court's approach to these cases. Nonetheless, given that the Court seems settled in its conclusion that racial gerrymandering claims such as these may be pursued, I endorse this proposition.

[8] Though expressly reserving the issue in *Shaw I*, we noted there that appellants wisely conceded that while "race-conscious redistricting is not always unconstitutional. . . . This Court has never held that race-conscious state decisionmaking is impermissible in *all* circumstances." 509 U. S., at 642 (emphasis in original). The threshold test for the application of strict scrutiny as set forth in *Miller* v. *Johnson*, 515 U. S. 900 (1995), implicitly accepts this as true, concluding that strict scrutiny applies not when race merely *influences* the districting process, but only when "the legislature *subordinated* traditional race-neutral districting principles . . . to racial considerations." *Id.*, at 916 (emphasis added); see also *id.*, at 928–929 (O'CONNOR, J., concurring) (test does not "throw into doubt the vast majority of the Nation's 435 congressional districts . . . even though race may well have been considered in the redistricting process"). *Shaw II* similarly recognizes that intent does not trigger strict scrutiny: Although the District Court concluded that the State "deliberately drew" the district in question to ensure that it included a majority of African-American citizens, see *Shaw*, 861 F. Supp., at 473; *Shaw II*, *ante*, at 905, the Court reviews the District Court's findings regarding the demographics of the district to determine whether the strict scrutiny was appropriately applied. See *ante*, at 905–906; cf. *ante*, at 999 (THOMAS, J., concurring in judgment) (where State intends to create majority-minority district, application of strict scrutiny not even a "close question").

JUSTICE THOMAS takes a strong view on this matter, arguing that a majority-minority district should escape strict scrutiny only when it is created "in spite of," not "because of," the race of its population. *Ante*, at 1001. But because minorities are, by definition, minorities in the population, it will be rare indeed for a State to stumble across a district in which the minority population is both large enough and segregated enough to allow majority-minority districts to be created with at most a "mere awareness" that the placement of the lines will create such a district. See *ibid.* Indeed, I doubt that any such district exists in the entire Nation; the creation of even the most compact majority-minority district will gen-

The conclusion that race-conscious districting should not always be subject to strict scrutiny merely recognizes that our equal protection jurisprudence can sometimes mislead us with its rigid characterization of suspect classes and levels of scrutiny. As I have previously noted, all equal protection jurisprudence might be described as a form of rational basis scrutiny; we apply "strict scrutiny" more to describe the likelihood of success than the character of the test to be applied. See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 452–453 (1985) (STEVENS, J., concurring). Because race has rarely been a legitimate basis for state classifications, and more typically an irrational and invidious ground for discrimination, a "virtually automatic invalidation of racial classifications" has been the natural result of the application of our equal protection jurisprudence. *Id.*, at 453. In certain circumstances, however, when the state action (i) has neither the intent nor effect of harming any particular group, (ii) is not designed to give effect to irrational prejudices held by its citizens but to break them down, and (iii) uses race as a classification because race is "relevant" to the benign goal of the classification, *id.*, at 454, we need not view the action with the typically fatal skepticism that we have used to strike down the most pernicious forms of state behavior. See *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267,

---

erally require a conscious decision to draw its lines "just so" to ensure that the group is not a minority in the district population. It appears, however, that even when a district is placed "just so" in order to include a traditional community in which race does correlate with community interests (consider, for example, New York District 15, which is centered on Harlem), JUSTICE THOMAS would review that district with the same presumption of invidiousness with which we viewed the district in *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960). Cf. *Miller*, 515 U. S., at 944 (GINSBURG, J., dissenting) (noting that "ethnicity itself can tie people together" in communities of interest). Because the creation of such a district threatens neither the harms of *Gomillion* nor, I believe, any harms against which the Fourteenth Amendment was intended to protect, I cannot accept his conclusion.

316–317 (1986) (STEVENS, J., dissenting); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 320 (1978). While the Court insisted in *Shaw I* that racial classifications of this sort injure the Nation (though not necessarily any particular group) in myriad ways, see 509 U. S., at 647–648, redistricting that complies with the three factors I outline above simply is not the sort of despicable practice that has been taken in the past to exclude minorities from the electoral process. See *Shaw II, ante,* at 931–933 (STEVENS, J., dissenting); *Shaw I,* 509 U. S., at 682–685 (SOUTER, J., dissenting); cf., *e. g., Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); *Terry* v. *Adams,* 345 U. S. 461 (1953). While any racial classification may risk some stereotyping, the risk of true "discrimination" in this case is extremely tenuous in light of the remedial purpose the classification is intended to achieve and the long history of resistance to giving minorities a full voice in the political process. Given the balancing of subtle harms and strong remedies—a balancing best left to the political process, not to our own well-developed but rigid jurisprudence—the plurality reasonably concludes that race-conscious redistricting is not always a form of "discrimination" to which we should direct our most skeptical eye.

### III

While the Court has agreed that race can, to a point, govern the drawing of district lines, it nonetheless suggests that at a certain point, when the State uses race "too much," illegitimate racial stereotypes threaten to overrun and contaminate an otherwise legitimate redistricting process. In *Miller,* the Court concluded that this point was reached when "race for its own sake, and not other districting principles, was the . . . dominant and controlling rationale" behind the shape of the district. 515 U. S., at 913. For strict scrutiny to apply, therefore, the plaintiff must demonstrate that "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness,

contiguity, [and] respect for political subdivisions . . . to racial considerations." *Id.*, at 916; see also *id.*, at 928 (O'CONNOR, J., concurring) (strict scrutiny should be applied only if State emphasized race in "substantial disregard" for traditional districting principles); *ante*, at 962 (opinion of O'CONNOR, J.).

Of course, determining the "predominant" motive of the Texas Legislature, *ante*, at 959 (citing *Miller*, 515 U. S., at 916), is not a simple matter.[9] The members of that body

---

[9] Because the Court's approach to cases of this kind seeks to identify the "predominant" motive of the legislature, it is worth pointing out, as we have on so many prior occasions, that it is often "difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators." *Palmer* v. *Thompson*, 403 U. S. 217, 225 (1971). As in every other legislative body, each of the members of Texas' Legislature has his or her own agenda and interests—particularly in the "complicated process" of redistricting, in which every decision "inevitably has sharp political impact." *White* v. *Weiser*, 412 U. S. 783, 795–796 (1973). In these circumstances, "[r]arely can it be said that a legislature . . . operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators . . . are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265 (1977) (footnote omitted); see also *Edwards* v. *Aguillard*, 482 U. S. 578, 636–639 (1987) (SCALIA, J., dissenting); *Shaw II*, *ante*, at 940 (STEVENS, J., dissenting).

Not only is this a case in which a legislature is operating under a "broad mandate," but other factors weigh in favor of deference as well. First, the inherently political process of redistricting is as much at the core of state sovereignty as any other. Second, the "motive" with which we are concerned is not *per se* impermissible. (For that reason, this litigation is very different from *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989), and *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977), in which the plaintiffs alleged that the defendant's action was motivated by an intent to harm individuals because of their status as members of a particular group. Where there is "proof that a discriminatory purpose has been a motivating factor in the decision," the "judicial deference" due to the legislative process is no longer justified. *Id.*, at 265–

faced many unrelenting pressures when they negotiated the creation of the contested districts. They had to ensure that there was no deviation in population from district to district.[10] They reasonably believed that they had to create districts that would comply with the Voting Rights Act. See *supra*, at 1007. If the redistricting legislation was to be enacted, they had to secure the support of incumbent Congressmen of both parties by drawing districts that would ensure their election. And all of these desires had to be achieved within a single contiguous district. Every time a district line was shifted from one place to another, each of these considerations was implicated, and additional, compensating shifts were necessary to ensure that all competing goals were simultaneously accomplished. In such a constrained environment, there will rarely be one "dominant and controlling" influence. Nowhere is this better illustrated

266.) Finally, those that are injured by the allegedly discriminatory districts can alleviate their injury through the democratic process: Those in the district could elect a representative who is not a part of their racial group, while the population at large could elect a legislature that refused to rely on racial considerations in the drawing of districts. In such circumstances we should take particular care in questioning the legislature's motives and, if in doubt, presume that the legislature has acted appropriately. See *post*, at 1058–1062 (SOUTER, J., dissenting).

[10] We require state legislatures to ensure that populations, from district to district, are "as mathematically equal as reasonably possible," with *de minimis* exceptions permissible only in "unavoidable" instances. *White* v. *Weiser*, 412 U. S., at 790; see also *Karcher*, 462 U. S., at 734–735. Population variances are not permissible even "'if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing . . . political subdivision boundaries.'" *White*, 412 U. S., at 791 (citing *Kirkpatrick* v. *Preisler*, 394 U. S. 526, 533–534 (1969)). The legislature, therefore, understandably felt compelled to achieve mathematical equality regardless of other concerns. Rather surprisingly, they were able to do so: Every one of Texas' 30 congressional districts contains precisely 566,217 persons. Of course, this precision could not have been accomplished without breaking apart counties, cities, neighborhoods, and even pre-existing voting precincts.

than in Dallas' District 30 where, at the very least, it is clear that race was *not* such an overriding factor.

## IV

The plurality lists several considerations which, when taken in combination, lead it to conclude that race, and no other cause, was the predominant factor influencing District 30's configuration. First, there is the shape itself. Second, there is evidence that the districts were intentionally drawn with consciousness of race in an effort to comply with the Voting Rights Act. Third, the plurality dismisses two race-neutral considerations (communities of interest and incumbency protection) that appellants advanced as race-neutral considerations that led to the odd shape of the districts. Finally, the plurality concludes that race was impermissibly used as a proxy for political affiliation during the course of redistricting. In my opinion, an appropriate reading of the record demonstrates that none of these factors—either singly or in combination—suggests that racial considerations "subordinated" race-neutral districting principles. I discuss each in turn.

### Bizarre Shape

As noted, *supra*, at 1003, and n. 6, Texas' Legislature concluded that it would add a new district to Dallas County that would incorporate the rapidly growing minority communities in South Dallas. To do so, the new district would have to fit into the existing districts: Before redistricting, most of southern Dallas County (including the African-American communities in South Dallas) was divided between Districts 5 and 24, represented by Democratic Representatives Bryant and Frost, respectively. The middle of the northern section of the county was divided between Districts 3 and 26, both represented by Republicans.

Then-State Senator Johnson began the redistricting process by proposing a compact, Democratic, majority-minority

district encompassing all of South Dallas. See App. 139; 861 F. Supp., at 1321, n. 22. Representatives Bryant and Frost objected, however, because the proposed district included not only Johnson's residence, but their own homes, located within only 10 miles of each other on opposite sides of the city. Furthermore, Johnson's plan transferred many of Frost and Bryant's most reliable Democratic supporters into the proposed district. Rather than acquiesce to the creation of this compact majority-minority district, Frost and Bryant insisted that the new district avoid both their own homes and many of the communities that had been loyal to them. Johnson's plan was, therefore, "quickly abandoned." *Ibid.*

To accommodate the incumbents' desires, District 30 required geographical adjustments that had telling effects on its shape. First, two notches carefully avoiding the residences of and neighborhoods surrounding Frost and Bryant were carved out of District 30's side. See Appendix D, *infra.*[11] Furthermore, Frost and Bryant retained several communities—many majority-black—along the southern and eastern sides of the proposed district. See generally 861 F. Supp., at 1321–1322.[12]

---

[11] This phenomenon is not unique to Dallas County: Throughout the State, "incumbent residences repeatedly fall just along district lines." 861 F. Supp., at 1318 (giving examples); see State's Exhs. 10A and 10B (showing incumbent residences). District 6, for instance, changed from a rural district stretching far to the southeast of Dallas to a more suburban district wrapping around Fort Worth. As it did so, however, the district pivoted around the home of incumbent Representative Joe Barton, whose residence sits at the extreme southeastern end of a district stretching in a 100-mile-long loop around Fort Worth. See Appendix D, *infra.*

[12] The plurality suggests that these communities were shed from District 30 in a "suspect use of race as a proxy to further neighboring incumbents' interests." *Ante,* at 979; see also *ante,* at 971–972, n. I had thought, however, that the Court's concern in these cases was the "resemblance to political apartheid" involved in the creation of majority-minority districts. *Shaw I,* 509 U. S. 630, 647 (1993). I do not see how the decision to *include* minority communities in a neighboring majority-white district bears any resemblance to such "apartheid" or, for that matter, how it has any rele-

Had these communities been retained by District 30, it would have been much more compact. By giving up these voters to Frost and Bryant, however, District 30 was forced to seek out population and Democratic voters elsewhere. The Democratic incumbents had blocked its way to the south and east; north (and, to a lesser extent, west) was the only way it could go.[13]

It would not have helped the prospects of a Democratic candidate in the new District 30 had it simply plowed directly north to pick up additional population. Immediately north of the city of Dallas are the "Park Cities," which include a population that has voted strongly Republican throughout recent elections. See State's Exhs. 9A and 9B (depicting one index of political affiliation in 1990 and 1992 elections). Rather than dilute the Democratic vote (and threaten the Republican incumbents) in this manner, District 30 skirted these communities on the west, and then curved east, picking up communities on either side of the region's major interstate freeways.[14]

As the process of extracting Democratic voters out of the core of the Republican districts in North Dallas progressed, the distinction between Democratic and Republican voters moved from the precinct level (the smallest level at which political affiliation data was immediately available in the re-

---

vance to the validity of the creation of a district from which those minority communities have been excluded. See also *infra*, at 1030–1032.

[13] See, *e. g.*, 3 Tr. 187 (testimony of Christopher Sharman: "[A]ny time you took part of a district away on one end, you would usually squeeze or push the district out on another end; and in this case, most of the time the district would get pushed to the north").

[14] The author of the District Court opinion was herself aware of these political realities. See *id.*, at 194 (Jones, J., noting that Johnson did not want anything to do with the Park Cities because she "[d]idn't want competition from Ross Perot"). In light of this recognition, it is difficult to understand why the District Court described District 30's efforts to avoid that community as a contributing factor to the allegedly race-based bizarreness of the district borders. See 861 F. Supp., at 1337; *ante*, at 967.

districting programs) down to the smaller census block level (the smallest level at which demographic and socioeconomic data was available).[15]  In an effort to further identify which census blocks were likely to support their candidacy, the incumbents used not only census data, but their own long experience as local representatives as well as the experiences of staffers and supporters.  See 3 Tr. 177–179, 181–182 (describing methods, such as simply driving through neighborhoods, that staff members and candidates for office used to develop block-specific information regarding the likely political affiliation of voters).[16]

In addition, although information about political affiliation was not available at the block level through the computer program, legislators and staffers were able to get relatively precise information about voter preferences through a system, developed by the Democratic Party, that allowed candidates to determine in which party primary voters had participated.  *Id.*, at 179–180.  By examining this information, legislators were able to further fine-tune district lines to include likely supporters and exclude those who would prob-

---

[15] Because political boundaries are more closely packed in urban than in rural areas, drawing lines based on such boundaries will almost always require tighter twists and turns in urban districts than in rural districts. Significantly, the three districts struck down by the District Court are the only three districts in the entire State with population densities of over 2,000 persons per square mile.  See U. S. Dept. of Commerce, Bureau of the Census, Population and Housing Characteristics for Congressional Districts of the 103d Congress: Texas 40–44 (Feb. 1993).  If enough empty land were added to these districts that they matched the sparse densities of rural districts (such as District 28, which was upheld by the District Court), their turns would not appear so sharp, and the open space, without its demographic implications, could smooth the deepest of the districts' notches.

[16] As Democratic communities were identified, they had to be connected with the core of the district.  Although Texas has no state statutory or constitutional requirement to that effect, state legislators agreed that each of the 30 districts should be entirely contiguous, permitting any candidate, map in hand, to visit every residence in her district without leaving it.

ably support their opponents. Cf. *Gaffney* v. *Cummings*, 412 U. S. 735, 753 (1973) ("[W]hen [political profiles are] overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another").[17]

The careful gerrymandering conducted by the Texas Legislature under the watchful eye of Johnson and her staff was a success not only on a districtwide level (Johnson was elected with over 70% of the vote in both 1992 and 1994), but on a precinct level. While the pre-1990 precincts in the heavily Republican North Dallas gave little reason for a Democratic incumbent to hope for much support, see State's Exh. 9B (maps of Dallas and Collin Counties with 1990 election index results showing only a few Democrat-leaning precincts in North Dallas), the gerrymandering that occurred in 1991 resulted in smaller precincts that, by all indications, gathered concentrations of Democratic voters into District 30 while leaving concentrations of Republican voters in surrounding Districts 3 and 26. See State's Exh. 9A (maps of Dallas and Collin Counties with 1992 election index results showing many more Democrat-leaning precincts in the North Dallas sections of District 30).

Presumably relying on *Shaw I*'s statement that "a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregat[e] . . . voters' on the basis of race," 509

---

[17] Incumbents influenced the shape of districts in other ways. Both District 30 and District 29, for instance, detoured to include portions of the state legislative districts that were being represented by the state legislators who hoped to run for Congress. See, *e. g.*, State's Exh. 31 (showing that portion of Tarrant County included in District 30 had been part of Johnson's State Senate district). In some cases, legislators drew districts to avoid the residences of potential primary challengers. See 3 Tr. 192–193; 4 *id.*, at 46. Incumbents also sought to include communities that they expected (or knew) to contain particularly active supporters; this interest in "active" voters often trumped any desire to ensure a particular racial makeup. See 3 *id.*, at 190; 4 *id.*, at 40–41; 861 F. Supp., at 1320.

U. S., at 646–647, the plurality offers mathematical proof that District 30 is one of the most bizarre districts in the Nation, see *ante*, at 960, and relates the now-obligatory florid description of the district's shape, *ante*, at 965–966; see also *ante*, at 973–974 (describing District 29). As the maps appended to this opinion demonstrate, neither District 30 nor the Houston districts have a monopoly on either of these characteristics. Three other majority-white districts are ranked along with the majority-minority districts as among the oddest in the Nation. See Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*, 92 Mich. L. Rev. 483, 565 (1993). Perhaps the clearest example of partisan gerrymandering outside of the context of majority-minority districts is District 6, a majority-Anglo district represented by a Republican.[18]

_____

[18] While two extremely noncompact majority-Anglo districts in Texas (Districts 3 and 25) might be able to blame part (though by no means all) of their contortions on their contiguity with the majority-minority districts, District 6 has little excuse. Although it shares a border with District 30 for a short distance, that stretch is one of the straightest in either of the districts, running almost entirely along the county line through the Dallas-Fort Worth International Airport. See Appendix D, *infra*.

As for the obligatory florid description: District 6 has far less of an identifiable core than any of the majority-minority districts struck down by the District Court. To the extent that it "begins" anywhere, it is probably near the home of incumbent Rep. Barton in Ennis, located almost 40 miles southwest of downtown Dallas. From there, the district winds across predominantly rural sections of Ellis County, finally crossing into Tarrant County, the home of Fort Worth. It skips across two arms of Joe Pool Lake, noses its way into Dallas County, and then travels through predominantly Republican suburbs of Fort Worth. Nearing the central city, the borders dart into the downtown area, then retreat to curl around the city's northern edge, picking up the airport and growing suburbs north of town. Worn from its travels into the far northwestern corner of the county (almost 70 miles, as the crow flies, from Ennis), the district lines plunge south into Eagle Mountain Lake, traveling along the waterline for miles, with occasional detours to collect voters that have built homes along its shores. Refreshed, the district rediscovers its roots in rural Parker

For every geographic atrocity committed by District 30, District 6 commits its own and more. District 30 split precincts to gerrymander Democratic voters out of Republican precincts; District 6 did the same. See State's Exh. 9B (Tarrant County, showing District 6 cuts). District 30 travels down a riverbed; District 6 follows the boundaries of a lake. District 30 combines various unrelated communities of interest within Dallas and its suburbs; District 6 combines rural, urban, and suburban communities. District 30 sends tentacles nearly 20 miles out from its core; District 6 *is* a tentacle, hundreds of miles long (as the candidate walks), and it has no core.

The existence of the equally bizarre majority-white District 6 makes the plurality's discussion of District 30's odd shape largely irrelevant. If anything, the similarities between Districts 6 and 30 suggest that it is more likely than not that the incumbency considerations that led to the mutation of District 6 were the same considerations that forced District 30 to twist and turn its way through North Dallas.[19]

County, then flows back toward Fort Worth from the southwest for another bite at Republican voters near the heart of that city. As it does so, the district narrows in places to not much more than a football field in width. Finally, it heads back into the rural regions of its fifth county—Johnson—where it finally exhausts itself only 50 miles from its origin, but hundreds of "miles apart in distance and worlds apart in culture." *Miller,* 515 U. S., at 908 (describing a similar combined rural/urban district).

[19] Seeking specific examples, the plurality makes much hay over a portion of Collin County located just over the county line north of Dallas. See *ante,* at 965, 971. There, District 30 excludes a portion of a precinct that voted Democratic in 1990, and maps "*exactly* onto the only area in the southern half of th[e] county with a [minority] percentage population in excess of 50%." *Ante,* at 965.

The map to which the plurality refers, however, groups the minority percentage by precinct, and since precincts are defined by the district boundaries, it is no surprise that the district maps "exactly" onto the precinct. See App. 153. (One might similarly argue that "District 30 maps *exactly* onto the only area in all of north Texas that is 50% black," but such a statement reveals little about the underlying demographics of spe-

The political, rather than the racial, nature of District 30's gerrymander is even more starkly highlighted by comparing it with the districts struck down in *Shaw II* and *Miller*. District 30's black population is, for instance, far more concentrated than the minority population in North Carolina's District 12. And in *Miller*, the Court made it clear that the odd shape of Georgia's Eleventh District was the result of a conscious effort to *increase* its proportion of minority populations: It was, the Court found, "'exceedingly obvious' from the shape of the Eleventh District, together with the racial demographics, that the drawing of narrow land bridges to incorporate within the district outlying appendages containing *nearly 80%* of the district's total black population was a deliberate attempt to bring black populations into the district." *Miller*, 515 U. S., at 917 (emphasis added; citation omitted).

District 30 is the precise demographic *converse* of the district struck down in *Miller*. District 30, for example, has a compact core in South Dallas which contains 50% of the district population and *nearly 70%* of the district's total black population. Cf. *ibid.* Unlike the appendages to Georgia's District 11, the tentacles stretching north and west

cific sections of the district.) The more telling maps are the census block maps, which demonstrate that the Collin County section of District 30 contains many more *census blocks* of less than 25% minority population than it does blocks that are more than 50% minority. See State's Exhs. 45 and 46 (Exh. 45 is reproduced, in part, as Appendix D, *infra*). Even if those majority-white blocks have relatively small populations, they were nonetheless included, suggesting that the creation of the district was not as single-mindedly focused on race as the Court and the District Court assume.

Even more significant is the fact that the new precinct leaned overwhelmingly Democratic in the 1992 election, while the portion of the precinct that was not included in District 30 voted overwhelmingly Republican. See State's Exh. 9B (Collin County). While the excluded portion of the 1990 precinct may have been dropped, in part, to help comply with the State's goals under the Voting Rights Act, it also involved a successful effort to maximize Democratic votes while avoiding Republican votes.

from District 30 add progressively less in the way of population, and, more important for purposes of this inquiry, they actually *reduce* the proportional share of minorities in the district. See State's Exh. 33.

For example: The worst offender, in the trained eye of the Court, may be the northern arm of the district that winds around the Park Cities and then up into Collin County. But that arm, which contains 22% of the population, is only 21% black, *ibid.*—a proportion essentially identical to the proportion of African-Americans in Dallas County as a whole.[20]

The plurality is certainly correct in pointing out that District 30's outlying reaches encompass some communities with high concentrations of minorities.[21] It is implausible

---

[20] See 861 F. Supp., at 1312 (black population in Dallas County is 362,130); Bureau of Census, Population and Housing Unit Counts 185 (Oct. 1993) (total population of Dallas County is 1,852,810).

[21] Several responses to the plurality's specific examples are worth making, however. In Collin County, the plurality relies on the fact that the "combined African-American and Hispanic" population in the Collin County extremity of the northern appendage to District 30 is in excess of 50%. *Ante,* at 971. But District 30 was created with an eye to a majority-*black* population, rather than a majority-minority population, so the more relevant facts are that (i) African-Americans make up only 19.8% of the Collin County appendage, App. 331, (ii) those African-Americans consist of only two-tenths of 1% of the entire population in the district, *ibid.*, and (iii) this appendage contains more *majority-white* census blocks than it does majority-minority census blocks, see State's Exh. 45.

The plurality also points out that a small portion of one of the tentacles—the one that extends west into Tarrant County—contains an African-American majority. *Ante,* at 965. It would be implausible to claim, however, that race was the "predominant" reason that this community was included in District 30. First, the community had been part of Senator Johnson's state legislative district, see n. 17, *supra;* second, it also includes majority-white census blocks; and third, the *total* population in that portion of the district is less than 2,000 people. App. 331. Finally, and more important, the population of the entire western tentacle (at the tip of which is the Tarrant County community) is only 29% black, see State's Exh. 33—less than half the proportion of minorities in the core of the district.

to suggest, however, that an effort to "segregate" voters drove District 30 to collect those populations. After all, even the District Court noted that African-American voters immediately adjacent to the core of District 30 were intentionally *excluded* from the district *"in order to protect incumbents."* 861 F. Supp., at 1339 (emphasis added). Forced into Republican territory to collect Democratic votes, the district intentionally picked up some minority communities (though far more majority-white communities). If it had not, the goal of creating a majority-black district would have been sacrificed to incumbency protection (the very sort of "predominance" of race over race-neutral factors that the plurality discredits). But unlike Georgia's District 11 and North Carolina's District 12, the *reason* that the district was there in the first place was not to collect minority communities, but to collect population—preferably Democrats. It would, therefore, be fanciful to assert that the "several appendages" to District 30 were "drawn for the obvious," let alone the *predominant,* "purpose of putting black populations into the district." *Miller,* 515 U. S., at 910.[22]

In sum, a fair analysis of the shape of District 30, like the equally bizarre shape of District 6, belies the notion that its shape was determined by racial considerations.

---

[22] Indeed, if the "appendages" to District 30 reaching into neighboring counties were cut off, the proportion of African-Americans in the resulting district would actually *increase.* See App. 331. As presently constituted, District 30 includes 566,217 people, of which 283,225 (or 50.02%) are African-American. If the Tarrant County and Collin County portions of the district were removed, the resulting district would have 557,218 people, of which 280,620 (or 50.36%) would be African-American. While the resulting district would not include the "zero deviation" necessary under *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and its progeny, see n. 10, *supra,* the missing population could easily be acquired in majority-black census blocks adjacent to District 30's southern and eastern edge, thereby increasing the proportion of black population still further. Because the alleged racial goals of the district could be achieved *more* effectively by making the district *more* compact, I simply do not comprehend how the plurality can conclude that the effort to create a majority-minority district "predominated" over other, race-neutral goals.

## *Intent*

Perhaps conscious that noncompact congressional districts are the rule rather than the exception in Texas, the plurality suggests, *ante*, at 960–961, 969–970, that the real key is the direct evidence, particularly in the form of Texas' §5 Voting Rights Act submissions and the person of then-State Senator Johnson, that the State expressed an intent to create these districts with a given "minimum percentage of the favored minority." 861 F. Supp., at 1309. Even if it were appropriate to rest this test of dominance on an examination of the subjective motivation of individual legislators,[23] or on

---

[23] Testimony by individuals is relevant, but hardly dispositive evidence of collective motivations. See n. 9, *supra.* It may be true that the most important concern motivating Senator Johnson, the Chairman of the Senate Districting Committee, was her desire to create the first Congressional District in the history of the State in which African-Americans were in the majority. Johnson never testified, however, that racial considerations were the *sole* concern motivating the changes to the shapes of the districts. See, *e. g.*, App. 454–456 (certain areas that were minority communities were assigned to Anglo incumbents because of incumbent power), *id.*, at 459 ("[J]ust as 30 went looking for friendly territory regardless of color, [the incumbents] went looking for friendly territory as well regardless of color"). Since this testimony was not only irrelevant to the §2 proceedings but arguably harmful to her claim there that racial considerations had been taken into account, these admissions are particularly telling.

To the extent that testimony of individual legislators is relevant, the following statements from the floor of the Texas House confirm that many legislators viewed these districts as political, not racial, gerrymanders:

"This plan was drawn to protect incumbents. . . .

"[I]n order to protect an incumbent Dallas congressman and an incumbent Houston congressman, county lines were not respected, urban boundaries were not respected, precinct boundaries were not respected." *Id.*, at 374–375 (statement of Rep. Ogden).

"With the adoption of this plan, you will have 8 Republican Congressmen out of 30. That's de facto regression and provides for less Republican representation in Washington, D. C.

"Communities throughout the State are surgically split in what appears to be illogical, irrational and erratic pattern[s]. But if you look at election result data throughout the State, you'll find that these lines are very logi-

testimony given in a legal proceeding designed to prove a conflicting conclusion,[24] this information does little more than confirm that the State believed it necessary to comply with the Voting Rights Act. Given its reasonable understanding of its legal responsibilities, see *supra*, at 1007, the legislature acted to ensure that its goal of creating a majority-black district in Dallas County was not undermined by the changes made to accommodate District 30 to other, race-neutral districting principles. As the plurality admits, see *ante*, at 958, the intent to create majority-minority districts does not in itself trigger strict scrutiny; these admissions prove nothing more than that. See also *Shaw II, ante*, at 930–932 (STEVENS, J., dissenting).

*Nonracial Factors: Community*

In an effort to provide a definitive explanation for the odd shape of the district, the State emphasized two factors: The

---

cal and very rational. The lines have been drawn, dissecting communities very creatively in order to pack Republicans and maximize Democratic representation." *Id.*, at 376 (statement of Rep. Gusendorf).

See also *id.*, at 377–380 (statement of Rep. Gusendorf illustrating the gerrymandering process by reference to District 6, not a majority-minority district).

These gerrymanders "d[o] not have to happen. It has nothing to do with fairness. It has nothing to do with minority representation because if we were really concerned about minority representation, we would have drawn this map in such a way that the minorities were considered and not simply to elect Democrats." *Id.*, at 384 (statement of Rep. Hill).

[24] It is ironic and slightly unfair for the plurality and District Court to use the State's § 5 submission and Congresswoman Johnson's testimony in a § 2 challenge to the congressional district as evidence against them in these cases. See, *e. g.*, 861 F. Supp., at 1319–1321, 1338–1339; *ante*, at 969–970. Both of those proceedings required the State to assure the Attorney General and a federal court, respectively, that the State had adequately considered the interests of minority voters in the 1991 redistricting process. Under such circumstances, it is not at all surprising that the relevant declarant would limit his or her comments to the role that race played in the redistricting process, for other considerations were largely irrelevant (the District Court's opinion to the contrary notwithstanding, see 861 F. Supp., at 1339).

presence of communities of interest tying together the populations of the district, and the role of incumbency protection. The District Court and the plurality improperly dismissed these considerations as ultimately irrelevant to the shape of the districts.

First, the appellants presented testimony that the districts were drawn to align with certain communities of interest, such as land use, family demographics, and transportation corridors. See 861 F. Supp., at 1322–1323. Although the District Court recognized that these community characteristics amounted to accurate descriptions of District 30, *id.*, at 1323, it dismissed them as irrelevant to the districting process, concluding that there was no evidence that "the Legislature had these particular 'communities of interest' in mind when drawing the boundaries of District 30." *Ibid.* The plurality concludes that appellants present no reason to displace that conclusion. *Ante,* at 966–967.

I do not understand why we should require such evidence ever to exist. It is entirely reasonable for the legislature to rely on the experience of its members when drawing particular boundaries rather than on clearly identifiable "evidence" presented by demographers and political scientists. Most of these representatives have been members of their communities for years. Unless the Court intends to interfere in state political processes even more than it has already expressed an intent to do, I presume that it does not intend to require States to create a comprehensive administrative record in support of their redistricting process. State legislators should be able to rely on their own experience, not only prepared reports. To the extent that the presence of obvious communities of interest among members of a district explicitly or implicitly guided the shape of District 30, it amounts to an entirely legitimate nonracial consideration.[25]

---

[25] As JUSTICE GINSBURG noted in her dissent in *Miller,* "ethnicity itself can tie people together" in communities of interest. 515 U. S., at 944; see also *Rogers* v. *Lodge,* 458 U. S. 613, 651 (1982) (STEVENS, J., dissenting)

*Nonracial Factors: Incumbency*

The plurality admits that the appellants "present a . . . substantial case for their claim that incumbency protection rivaled race in determining the district's shape." *Ante,* at 967. Every individual who participated in the redistricting process knew that incumbency protection was a critical factor in producing the bizarre lines and, as the plurality points out, *ante,* at 963–964, even the District Court recognized that this nearly exclusive focus on the creation of "safe" districts for incumbents was intimately related to the bizarre shape of district lines throughout the State.

> "[I]n Texas in 1991, many incumbent protection boundaries sabotaged traditional redistricting principles as they routinely divided counties, cities, neighborhoods, and regions. For the sake of maintaining or winning seats in the House of Representatives, Congressmen or would-be Congressmen shed hostile groups and potential opponents by fencing them out of their districts. The Legislature obligingly carved out districts of apparent supporters of incumbents, . . . and then added appendages to connect their residences to those districts. The final result seems not one in which the people select their representatives, but in which the representatives

("Whenever identifiable groups in our society are disadvantaged, they will share common political interests and tend to vote as a 'bloc' "). Furthermore, it may be that the very fact of racial bloc voting, a prerequisite to § 2 liability, see *Thornburg* v. *Gingles,* 478 U. S. 30, 51 (1986) (and, under the Court's recent jurisprudence, to the voluntary formation of a majority-minority district), demonstrates the presence of a minority community. While communities based on race may merit a more skeptical review to ensure that a bond, rather than mere stereotyping, ties the community, see 861 F. Supp., at 1338, recognition of such a community in an electoral district certainly could, in certain circumstances, serve as a legitimate race-neutral explanation for particularly odd district shapes. By suggesting the contrary, I believe that the District Court erred. See *ibid.; post,* at 1060–1061 (SOUTER, J., dissenting).

1028

have selected the people." 861 F. Supp., at 1334 (citations and footnotes omitted).

See also *id.*, at 1335, n. 43. Despite this overwhelming evidence that incumbency protection was *the* critical motivating factor in the creation of the bizarre Texas districts, the District Court reached the stunning conclusion that because the process was so "different in degree" from the "generalized, and legitimate, goal of incumbent and seniority protection" that this Court has previously recognized, it could not serve as a legitimate explanation for the bizarre boundaries of the congressional districts. *Id.*, at 1334–1335. In dismissing incumbency protection once and for all, the District Court stated that "[i]ncumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering." *Id.*, at 1336.

It is difficult to know where to begin to attack the misperceptions reflected in these conclusions,[26] and the plurality's failure to do so seriously taints its evaluation of the relative importance of nonracial considerations in the creation of District 30. The initial problem, of course, is that under the Court's threshold test as set forth in *Miller*, one must consider the role of incumbency protection *before* determining whether there is an "unconstitutional racial gerrymander." And because the ultimate focus in these gerrymandering cases is the claim that race was the "dominant and controlling rationale in drawing [the] district lines," 515 U. S., at 913, a court *must*, in applying that test, consider a State's claim that a given race-neutral rationale controlled the creation of those lines. See *id.*, at 916 ("Where [compactness, contiguity,] or *other race-neutral considerations* are the basis for redistricting legislation, and are not subordinated to race, a State can 'defeat a claim that a district has been

---

[26] The District Court's legal analysis was probably flawed in part because its decision was issued before this Court announced its opinion in *Miller*.

gerrymandered on racial lines'"). Although a court may not like the State's explanation, that is no excuse for ignoring it.

If some independent bar prevented the use of that race-neutral criterion, then the District Court might be in a position to object to the State's use of it. We have, however, affirmed that a State has an interest in incumbency protection, see, e. g., ante, at 964–965 (opinion of O'CONNOR, J.); White v. Weiser, 412 U. S. 783, 791, 797 (1973), and also assured States that the Constitution does not require compactness, contiguity, or respect for political borders, see Shaw I, 509 U. S., at 647. While egregious political gerrymandering may not be particularly praiseworthy, see infra, at 1038–1040, it may nonetheless provide the race-neutral explanation necessary for a State to avoid strict scrutiny of the district lines where gerrymandering is the "dominant and controlling" explanation for the odd district shapes.[27]

The District Court's error had an apparently dispositive effect on its assessment of whether strict scrutiny should apply at all. Although aspects of our dispute with the plurality are "largely factual," ante, at 971, n., they arise not out of our disagreement with the District Court's credibility assessments, but out of that court's erroneous conclusion that the State's overwhelming reliance on this race-neutral factor was illegitimate and irrelevant to its evaluation of the factors involved in the shifting of this district's lines. A fair evaluation of the record made in light of appropriate legal standards requires a conclusion very different from the District Court's. By following the District Court down its misdirected path, the plurality itself goes astray.

---

[27] While it may be that the political gerrymandering in this case is "different in degree" from that previously recognized, 861 F. Supp., at 1334, I do not believe that the reference in Shaw I and Miller to "traditional" districting principles, see Shaw I, 509 U. S., at 642; Miller, 515 U. S., at 916, was intended to prohibit a State from changing the process or policies underlying the complex negotiating process that is modern redistricting.

## Race as a Proxy

Faced with all this evidence that politics, not race, was the predominant factor shaping the district lines, the plurality ultimately makes little effort to contradict appellants' assertions that incumbency protection was far more important in the placement of District 30's lines than race. See *ante*, at 967–969. Instead, it adopts a fallback position based on an argument far removed from even the "analytically distinct" claim set forth in *Shaw I*, 509 U. S., at 652. In it, the plurality suggests that even if the predominant reason for the bizarre features of the majority-minority districts was incumbency protection, the State impermissibly used race as a proxy for determining the likely political affiliation of blocks of voters. See *ante*, at 968–971 (opinion of O'CONNOR, J.).

The effect of this process, in all likelihood, was relatively unimportant to the overall shape of the district. A comparison of the 1992 precinct results with a depiction of the proportion of black population in each census block reveals that Democratic-leaning precincts cover a far greater area than majority-black census blocks. Compare State's Exh. 9A with State's Exh. 45. One would expect the opposite effect if the single-minded goal of those drawing the districts was racial composition rather than political affiliation. At the very least, the maps suggest that the drawing of boundaries involves a demographic calculus far more complex than simple racial stereotyping.

Furthermore, to the extent that race served as a proxy at all, it did so merely as a means of "fine tuning" borders that were already in particular locations for primarily political reasons. This "fine tuning" through the use of race is, of course, little different from the kind of fine tuning that could have legitimately occurred around the edges of a compact majority-minority district.[28] I perceive no reason why a

---

[28] The plurality expresses particular concern over the use of computer programs, particularly the availability of block-by-block racial data, and

legitimate process—choosing minority voters for inclusion in a majority-minority district—should become suspect once nonracial considerations force district lines away from its core.

Finally, I note that in most contexts racial classifications are invidious because they are irrational. For example, it is irrational to assume that a person is not qualified to vote or to serve as a juror simply because she has brown hair or brown skin. It is neither irrational, nor invidious, however, to assume that a black resident of a particular community is a Democrat if reliable statistical evidence discloses that 97% of the blacks in that community vote in Democratic primary elections. See Brief for United States 44. For that reason, the fact that the architects of the Texas plan sometimes appear to have used racial data as a proxy for making political judgments seems to me to be no more "unjustified," *ante*, at 969 (opinion of O'CONNOR, J.), and to have no more constitutional significance, than an assumption that wealthy suburbanites, whether black or white, are more likely to be Repub-

---

argues that the State's effort to "compil[e] detailed racial data," *ante*, at 967, is evidence of the controlling role of race in the computer-dominated process of redistricting. See *ante*, at 961–962; 861 F. Supp., at 1318–1319. It is worth noting, however, that the State made no particular "effort" to gather these data; it was included, along with similarly detailed information about sex, age, and income levels, in the data set provided by the Census Bureau and imported wholesale into the State's redistricting computers. Cf. *Shaw*, 861 F. Supp., at 457. Furthermore, even if the computer was used to fine tune the district lines to ensure that minority communities were included in District 30 (rather than individualized requests from candidates and their staffers on the basis of block-level data, see *supra*, at 1017–1018), such a technique amounts to little more than the use of a particularly efficient and accurate means of ensuring that the intended nature of the district was not undermined as incumbency protection forced it out of a compact district. I do not suggest that the end can always justify the means, but if those means are no more invidious than the end itself, I do not understand why their use should affect the analysis. I would not condemn state legislation merely because it was based on accurate information.

licans than Communists.[29]  Requiring the State to ignore the association between race and party affiliation would be no more logical, and potentially as harmful, as it would be to prohibit the Public Health Service from targeting African-American communities in an effort to increase awareness regarding sickle-cell anemia.[30]

Despite all the efforts by the plurality and the District Court, then, the evidence demonstrates that race was not, in all likelihood, the "predominant" goal leading to the creation of District 30.  The most reasonable interpretation of the record evidence instead demonstrates that political consider-ations were.  In accord with the presumption against inter-ference with a legislature's consideration of complex and competing factors, see n. 9, *supra,* I would conclude that the configuration of District 30 does not require strict scrutiny.

---

[29] "A prediction based on a racial characteristic is not necessarily more reliable than a prediction based on some other group characteristic.  Nor, since a legislator's ultimate purpose in making the prediction is political in character, is it necessarily more invidious or benign than a prediction based on other group characteristics.  In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders." *Mobile* v. *Bolden,* 446 U. S. 55, 88 (1980) (STEVENS, J., concurring in judgment) (footnote omitted).

To the extent that a political prediction based on race is incorrect, the voters have an entirely obvious way to ensure that such irrationality is not relied upon in the future: Vote for a different party.  A legislator relying on racial demographics to ensure his or her election will learn a swift lesson if the presumptions upon which that reliance was based are incorrect.

[30] I find it particularly ironic that the Court considers the use of race *verboten* in this benign context, while the Court just recently, on the basis of evidence that, *inter alia,* "[m]ore than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black," dismissed out of hand the Ninth Circuit's assumption that "people of *all* races commit *all* types of crimes." *United States* v. *Armstrong, ante,* at 469.  The Ninth Circuit's conclusion, it seems to me, is a model of the sort of race-neutral decision-making that this Court insists should be a part of constitutional decision-making processes.

## V

The Houston districts present a closer question on the application of strict scrutiny. There is evidence that many of the same race-neutral factors motivating the zigzags of District 30 were present at the creation (or recreation) of Districts 29 and 18. In contrast to District 30, however, there is also evidence that the interlocking shapes of the Houston districts were specifically, and almost exclusively, the result of an effort to create, out of largely integrated communities, both a majority-black and a majority-Hispanic district. For purposes of this opinion, then, I am willing to accept, *arguendo*, the plurality's conclusion that the Houston districts should be examined with strict scrutiny.[31] Even so, the plurality errs by concluding that these districts would fail that test.

The plurality begins with the perfectly obvious assumptions that a State has a compelling interest in complying with § 2 of the Voting Rights Act and that Texas had a strong basis for believing that it would have violated that Act in 1991 if it did not create three new majority-minority districts.[32] The plurality goes on to conclude, however, that because the final shape of these districts is not coextensive with the community that would form the core of a § 2 violation, these districts would not be "narrowly tailored" to further that state interest. *Ante*, at 979. I respectfully disagree.

Neither evidence nor insinuation suggests that the State in the redistricting process considered race for any reason

---

[31] Although I conclude that no reasonable interpretation of the record would require the application of strict scrutiny to District 30, I believe for the reasons that follow that it, too, would survive strict scrutiny if it were to be subject to that level of review.

[32] While I believe that the evidence supporting the State's conclusions in this regard is stronger than that suggested by the plurality or JUSTICE KENNEDY in his concurring opinion, I will simply assume, *arguendo*, as the plurality does, that the State had a reasonable fear of liability under § 2. See also *supra*, at 1007.

other than as a means of accomplishing its compelling interest of creating majority-minority districts in accord with the Voting Rights Act. The goal was, by all accounts, achieved, for these districts would certainly avoid liability under § 2 of the Voting Rights Act.[33] For reasons that continue to escape me, however, the plurality simply insists that the lack of compactness in the districts prevents them from being "narrowly tailored" solutions to the State's interests.

The plurality uses two premises to reach its conclusion that compactness is required to meet the "narrow tailoring" requirement: (i) § 2 would not have been violated unless a reasonably compact majority-minority district could have been created; and (ii) nothing in § 2 requires the creation of a noncompact district. I have no quarrel with either proposition, but each falls far short of mandating the conclusion that the plurality draws from it. While a State can be liable for a § 2 violation only if it could have drawn a compact district and failed to do so, it does not follow that creating such a district is the only way to avoid a § 2 violation. See generally *Shaw II, ante,* at 946–950 (STEVENS, J., dissenting). The plurality admits that a State retains "a limited degree of leeway" in drawing a district to alleviate fears of § 2 liability, *ante,* at 977, but if there is no independent constitutional duty to create compact districts in the first place, and the plurality suggests none, there is no reason why noncompact districts should not be a permissible method of avoiding violations of law. The fact that they might be unacceptable judicial remedies does not speak to the question whether they

---

[33] Even if the Court in *Shaw II* is correct in asserting that North Carolina's District 12 would not have allowed the State to avoid liability under § 2, see *ante,* at 916–918, no such plausible argument could be made in these cases. The core of District 30, for instance, contains more than half of all the African-American population in the district, and coincides precisely with the heart of the compact community that the State reasonably believes would give rise to a § 2 violation were it not placed in a majority-minority district. The same facts are true with respect to the Houston districts.

may be acceptable when adopted by a state legislature. Because these districts satisfy the State's compelling interest and do so in a manner that uses racial considerations only in a way reasonably designed to ensure such a satisfaction, I conclude that the districts are narrowly tailored.

## VI

I cannot profess to know how the Court's developing jurisprudence of racial gerrymandering will alter the political and racial landscape in this Nation—although it certainly *will* alter that landscape. As the Court's law in this area has developed, it has become ever more apparent to me that the Court's approach to these cases creates certain perverse incentives and (I presume) unanticipated effects that serve to highlight the essentially unknown territory into which it strides. Because I believe that the social and political risks created by the Court's decisions are not required by the Constitution, my first choice would be to avoid the preceding analysis altogether, and leave these considerations to the political branches of our Government.

The first unintended outcome of the legal reasoning in *Shaw II* and this case is the very result that those decisions seek to avoid: the predominance of race in the districting process, over all other principles of importance. Given the Court's unwillingness to recognize the role that race-neutral districting principles played in the creation of the bizarrely shaped districts in both this case and *Shaw II*, it now seems clear that the only way that a State can both create a majority-minority district and avoid a racial gerrymander is by drawing, "without much conscious thought," *ante*, at 967 (opinion of O'CONNOR, J.), and within the "limited degree of leeway" granted by the Court, *ante*, at 977, the precise compact district that a court would impose in a successful §2 challenge. See *post*, at 1066–1067 (SOUTER, J., dissenting). After the Court's decisions today, therefore, minority voters can make up a majority only in compact districts, whether

intentionally or accidentally drawn, while white voters can be placed into districts as bizarre as the State desires.

The great irony, of course, is that by *requiring* the State to place the majority-minority district in a particular place and with a particular shape, the district may stand out as a stark, placid island in a sea of oddly shaped majority-white neighbors. See Karlan, Still Hazy After All These Years: Voting Rights in the Post-*Shaw* Era, 26 Cumberland L. Rev. 287, 309 (1995–1996). The inviolable sanctity of the §2-eligible districts will signal in a manner more blatant than the most egregious of these racial gerrymanders that "a minority community sits here: Interfere with it not." The Court-imposed barriers limiting the shape of the district will interfere more directly with the ability of minority voters to participate in the political process than did the oddly shaped districts that the Court has struck down in recent cases. Unaffected by the new racial jurisprudence, majority-white communities will be able to participate in the districting process by requesting that they be placed into certain districts, divided between districts in an effort to maximize representation, or grouped with more distant communities that might nonetheless match their interests better than communities next door. By contrast, none of this political maneuvering will be permissible for majority-minority districts, thereby segregating and balkanizing them far more effectively than the districts at issue here, in which they were manipulated in the political process as easily as white voters. This result, it seems to me, involves "discrimination" in a far more concrete manner than did the odd shapes that so offended the Court's sensibilities in *Miller*, *Shaw II*, and these cases.

In light of this Court's recent work extolling the importance of state sovereignty in our federal scheme, cf. *Seminole Tribe of Fla.* v. *Florida, ante,* p. 44, I would have expected the Court's sensibilities to steer a course rather more deferential to the States than the one that it charts with its

decisions today. As we have previously noted, "[e]lectoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests." *Miller*, 515 U. S., at 915; see also *post*, at 1047–1048 (SOUTER, J., dissenting). The record in these cases evidences the "complex interplay of forces that enter a legislature's redistricting calculus," 515 U. S., at 915–916, and the Court's failure to respect those forces demonstrates even less respect for the legislative process than I would have expected after the decision in *Miller*.

The results are not inconsequential. After *Miller* and today's decisions, States may find it extremely difficult to avoid litigation flowing from decennial redistricting. On one hand, States will risk violating the Voting Rights Act if they fail to create majority-minority districts. If they create those districts, however, they may open themselves to liability under *Shaw* and its progeny. See *Miller*, 515 U. S., at 949 (GINSBURG, J., dissenting). Perhaps States will simply avoid the problem by abandoning voluntary compliance with § 2 of the Voting Rights Act altogether. See *Shaw I*, 509 U. S., at 672 (White, J., dissenting); *post*, at 1063–1064 (SOUTER, J., dissenting).[34] This result would not necessarily bring peace to redistricting, for there is no guarantee that districts created by court order to comply with § 2 will be immune from attack under *Shaw;* in both Florida and Illinois, for instance, that very sort of schizophrenic second-guessing has already occurred. See *King* v. *State Bd. of Elections*,

---

[34] The difficulty of balancing between these competing legal requirements will only be exacerbated by the ability of litigants (and courts) to use evidence proffered in defense by the State or its actors in one context as evidence *against* the State in another. See n. 24, *supra*. While there is nothing wrong with using prior inconsistent statements (to the extent that they really are inconsistent), States will be all the more unwilling to enter into the process at all given the certainty that they will be subject to suits in which evidence offered in one as defense will be fodder for the plaintiffs in another.

No. 95–C–827, 1996 WL 130439 (ND Ill., Mar. 15, 1996); *Johnson* v. *Mortham*, 926 F. Supp. 1460 (ND Fla. 1996). Given the difficulty of reconciling these competing legal responsibilities, the political realities of redistricting, and the cost of ongoing litigation, some States may simply step out of the redistricting business altogether, citing either frustration or hopes of getting a federal court to resolve the issues definitively in a single proceeding. See, *e. g.*, *Johnson* v. *Miller*, 922 F. Supp. 1556, 1559 (SD Ga. 1995) (after remand from *Miller*, Georgia Legislature abdicated its redistricting responsibilities to Federal District Court); *post*, at 1064 (SOUTER, J., dissenting) (noting the likely "vacuum of responsibility" at the state level).

Regardless of the route taken by the States, the Court has guaranteed that federal courts will have a hand—and perhaps the only hand—in the "abrasive task of drawing district lines." *Wells* v. *Rockefeller*, 394 U. S. 542, 553 (1969) (White, J., dissenting). Given the uniquely political nature of the redistricting process, I fear the impact this new role will have on the public's perception of the impartiality of the Federal Judiciary. I can only reiterate the Court's cautionary admonition, issued over two decades ago, that "[i]n fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *White* v. *Weiser*, 412 U. S., at 795 (citing *Whitcomb* v. *Chavis*, 403 U. S. 124, 160 (1971)).

I do not wish to leave the impression that decisions of the Court from *Shaw I* to the present are focusing on entirely nonexistent problems. I merely believe that the Court has entirely misapprehended the nature of the harm that flows from this sort of gerrymandering. Rather than attach blameworthiness to a decision by the majority to *share* political power with the victims of past discriminatory practices, the Court's real concern should be with the more significant harms that flow from legislative decisions that "serve no

purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community." *Karcher* v. *Daggett*, 462 U. S. 725, 748 (1983) (STEVENS, J., concurring). These cases are as good an illustration of such self-serving behavior on the part of legislators as any—but not with respect to racial gerrymandering. The real problem is the politically motivated gerrymandering that occurred in Texas. Many of the oddest twists and turns of the Texas districts would never have been created if the legislature had not been so intent on protecting party and incumbents. See also *Shaw II, ante,* at 937–938 (STEVENS, J., dissenting) (noting the same influences behind the bizarre shape of North Carolina's District 12).

By minimizing the critical role that political motives played in the creation of these districts, I fear that the Court may inadvertently encourage this more objectionable use of power in the redistricting process.[35] Legislatures and elected representatives have a responsibility to behave in a way that incorporates the "elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." *Cleburne,* 473 U. S., at 452. That responsibility is not discharged when legislatures permit and even encourage incumbents to use their positions as public servants to protect themselves and their parties rather than the interests of their constituents. See *Karcher* v. *Daggett,* 462 U. S., at 748, 754 (STEVENS, J., concurring). If any lines in Texas are worth straightening,

---

[35] The contrary is also possible, of course. Perhaps the burgeoning role of federal courts in this process, along with their relative isolation from the political pressures that motivate legislatures to bend district lines, will mean that there will actually be fewer politically gerrymandered districts. Regardless of whether political gerrymanders are more or less prevalent after our decisions today, my point is the same: The Court has its hierarchy of values upside down.

it is those that were twisted to exclude, not those altered to include.[36]

## VII

The history of race relations in Texas and throughout the South demonstrates overt evidence of discriminatory voting practices lasting through the 1970's. Brischetto, Richards, Davidson, & Grofman, Texas, in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990, pp. 233–248 (C. Davidson & B. Grofman eds. 1994). Even in recent years, Texans have elected only two black candidates to statewide office; majority-white Texas districts have never elected a minority to either the State Senate or the United States Congress. Brief for Appellants in No. 94–806, p. 53. One recent study suggests that majority-white districts throughout the South remain suspiciously unlikely

---

[36] My view that a State may act unconstitutionally by gerrymandering to minimize the influence of a group on the political process is consistent with the belief that there is no constitutional error in the drawing of district lines based on benign racial considerations. As Justice Powell noted in his opinion in *Davis* v. *Bandemer*, 478 U. S., at 165, there is a sharp distinction between "gerrymandering in the 'loose' sense" (*i. e.*, the drawing of district lines to advance general political and social goals), and "gerrymandering that amounts to unconstitutional discrimination" (*i. e.*, the drawing of district lines for the sole purpose of "'occupy[ing] a position of strength at a particular time, or to disadvantage a politically weak segment of the community,'" *id.*, at 164 (citing *Karcher*, 462 U. S., at 748 (STEVENS, J., concurring)). See also 478 U. S., at 125, n. 9 ("[A] preference for nonpartisan as opposed to partisan gerrymanders . . . merely recognizes that nonpartisan gerrymanders in fact are aimed at guaranteeing rather than infringing fair group representation"). While I believe that allegations of discriminatory intent and impact, if proved, should give rise to a constitutional violation, *Shaw, Miller,* and these cases all involve allegations of both impact and intent that are far more diffuse than the allegations to which we have traditionally directed our most rigorous review. See *Shaw II, ante,* at 921–923 (STEVENS, J., dissenting); cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). Limiting the constitutional ban on gerrymandering to those claims alleging that a specific group (as opposed to every group) has been harmed would be far more consistent with prior precedent than the Court's still-developing jurisprudence of racial gerrymandering.

to elect black representatives. Davidson & Grofman, The Effect of Municipal Election Structure on Black Representation in Eight Southern States, in Quiet Revolution in the South, at 344. And nationwide, fewer than 15 of the hundreds of legislators that have passed through Congress since 1950 have been black legislators elected from majority-white districts.[37] In 1994, for example, 36 of the Nation's 39 black Representatives were elected from majority-minority districts, while only 3 were elected from majority-white districts.[38] See *post*, at 1050–1051 (SOUTER, J., dissenting).

Perhaps the state of race relations in Texas and, for that matter, the Nation, is more optimistic than might be expected in light of these facts. If so, it may be that the plurality's exercise in redistricting will be successful. Perhaps minority candidates, forced to run in majority-white districts, will be able to overcome the long history of stereotyping and discrimination that has heretofore led the vast majority of majority-white districts to reject minority candidacies. Perhaps not. I am certain only that bodies of elected federal and state officials are in a far better position than anyone on this Court to assess whether the Nation's long history of discrimination has been overcome, and that nothing in the Constitution requires this unnecessary intrusion into the ability of States to negotiate solutions to political differences while providing long-excluded groups the opportunity to participate effectively in the democratic process. I respectfully dissent.

[Appendixes to opinion of STEVENS, J., follow this page.]

---

[37] Compare 51 Congressional Quarterly 10 (1993) (list of African-Americans who have served in Congress through the end of 1992) and Supplement to 52 Congressional Quarterly 10 (Nov. 12, 1994) (listing minorities in the 104th Congress) with biyearly publications of The Almanac of American Politics (published 1975-present).

[38] D. Bositis, Joint Center for Political and Economic Studies, African-Americans & the 1994 Midterms 22 (rev. May 1995). Fifteen black candidates ran for office in majority-white districts. *Ibid.*

APPENDIX A TO OPINION OF STEVENS, J.

TEXAS CONGRESSIONAL DISTRICT 3

APPENDIX B TO OPINION OF STEVENS, J.

TEXAS CONGRESSIONAL DISTRICT 6

APPENDIX C TO OPINION OF STEVENS, J.

TEXAS CONGRESSIONAL DISTRICT 25

APPENDIX D TO OPINION OF STEVENS, J.

DALLAS–FORT WORTH AREA
CONGRESSIONAL DISTRICTS
After 1991 Redistricting

Before 1991 Redistricting

★ = Incumbent Residence

WISE

DENTON ★26

COLLIN
★3

ROCKWALL

KAUFM

5

PARKER

12

6

TARRANT

30 DALLAS

ELLIS
24

HOOD

JOHNSON

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

When the Court devises a new cause of action to enforce a constitutional provision, it ought to identify an injury distinguishable from the consequences of concededly constitutional conduct, and it should describe the elements necessary and sufficient to make out such a claim. Nothing less can give notice to those whose conduct may give rise to liability or provide standards for courts charged with enforcing the Constitution. Those principles of justification, fair notice, and guidance have never been satisfied in the instance of the action announced three Terms ago in *Shaw* v. *Reno*, 509 U. S. 630 (1993) *(Shaw I)*, when a majority of this Court decided that a State violates the Fourteenth Amendment's Equal Protection Clause by excessive consideration of race in drawing the boundaries of voting districts, even when the resulting plan does not dilute the voting strength of any voters and so would not otherwise give rise to liability under the Fourteenth or Fifteenth Amendments, or under the Voting Rights Act.

Far from addressing any injury to members of a class subjected to differential treatment, the standard presupposition of an equal protection violation, *Shaw I* addressed a putative harm subject to complaint by any voter objecting to an untoward consideration of race in the political process. Although the Court has repeatedly disclaimed any intent to go as far as to outlaw all conscious consideration of race in districting, after three rounds of appellate litigation seeking to describe the elements and define the contours of the *Shaw* cause of action, a helpful statement of a *Shaw* claim still eludes this Court. This is so for reasons that go to the conceptual bone.

The result of this failure to provide a practical standard for distinguishing between the lawful and unlawful use of race has not only been inevitable confusion in statehouses and courthouses, but a consequent shift in responsibility for

setting district boundaries from the state legislatures, which are invested with front-line authority by Article I of the Constitution, to the courts, and truly to this Court, which is left to superintend the drawing of every legislative district in the land.

Today's opinions do little to solve *Shaw*'s puzzles or return districting responsibility to the States. To say this is not to denigrate the importance of JUSTICE O'CONNOR's position in her separate opinion, *ante*, at 990–992, that compliance with § 2 of the Voting Rights Act is a compelling state interest; her statement takes a very significant step toward alleviating apprehension that *Shaw* is at odds with the Voting Rights Act. It is still true, however, that the combined plurality, minority, and Court opinions do not ultimately leave the law dealing with a *Shaw* claim appreciably clearer or more manageable than *Shaw I* itself did. And to the extent that some clarity follows from the knowledge that race may be considered when reasonably necessary to conform to the Voting Rights Act, today's opinions raise the specter that this ostensible progress may come with a heavy constitutional price. The price of *Shaw I*, indeed, may turn out to be the practical elimination of a State's discretion to apply traditional districting principles, widely accepted in States without racial districting issues as well as in States confronting them.

As the flaws of *Shaw I* persist, and as the burdens placed on the States and the courts by *Shaw* litigation loom larger with the approach of a new census and a new round of redistricting, the Court has to recognize that *Shaw*'s problems result from a basic misconception about the relation between race and districting principles, a mistake that no amount of case-by-case tinkering can eliminate. There is, therefore, no reason for confidence that the Court will eventually bring much order out of the confusion created by *Shaw I*, and because it has not, in any case, done so yet, I respectfully dissent.

I

As its text indicates and our cases have necessarily and repeatedly recognized,[1] Article I of the Constitution places responsibility for drawing voting districts on the States in the first instance. See Art. I, §2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature"); Art. I, §4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations"). The Court has nonetheless recognized limits on state districting autonomy when it could discern a strong constitutional justification and a reasonably definite standard for doing so, as, for example, in announcing the numerical requirement of one person, one vote, see *Reynolds* v. *Sims,* 377 U. S. 533 (1964).[2] But the Court has never ignored the

---

[1] See, *e. g., Growe* v. *Emison,* 507 U. S. 25, 34 (1993) ("[T]he Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts") (citing U. S. Const., Art. I, §2); *Voinovich* v. *Quilter,* 507 U. S. 146, 156 (1993); *Reynolds* v. *Sims,* 377 U. S. 533, 586 (1964).

[2] Even in the no longer controversial instance of the one-person, one-vote rule, the adequacy of justification and standard was subject to sharp dispute, and some of the Court's best minds expressed principled hesitation to go even this far into what has been called the political thicket, see *id.,* at 615 (Harlan, J., dissenting) ("The Court's elaboration of its new 'constitutional' doctrine indicates how far—and how unwisely—it has strayed from the appropriate bounds of its authority. The consequence of today's decision is that in all but the handful of States which may already satisfy the new requirements the local District Court or, it may be, the state courts, are given blanket authority and the constitutional duty to supervise apportionment of the State Legislatures. It is difficult to imagine a more intolerable and inappropriate interference by the judiciary with the independent legislatures of the States"); *Baker* v. *Carr,* 369

Constitution's commitment of districting responsibility to the political branches of the States and has accordingly assumed over the years that traditional districting principles widely accepted among States represented an informal baseline of acceptable districting practices. We have thus accorded substantial respect to such traditional principles (as those, for example, meant to preserve the integrity of neighborhood communities, to protect incumbents, to follow existing political boundaries, to recognize communities of interest, and to achieve compactness and contiguity); we have seen these objectives as entirely consistent with the Fourteenth and Fifteenth Amendments' demands. See, e. g., id., at 578 ("A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme"); *White* v. *Weiser,* 412 U. S. 783, 797 (1973) ("[T]he District Court did not suggest or hold that the legislative policy of districting so as to preserve the constituencies of congressional incumbents was unconstitutional or even undesirable"); *Voinovich* v. *Quilter,* 507 U. S. 146, 156 (1993) ("Because the States . . . derive their reapportionment authority . . . from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements") (internal quotation marks omitted; citation omitted).

The fundamental tenet underlying most of these constitutionally unobjectionable principles (respect for communities of interest or neighborhoods, say) is that voting is more than

U. S. 186, 267 (1962) (Frankfurter, J., dissenting) ("The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements").

an atomistic exercise.[3]   Although it is the law of the Constitution that representatives represent people, not places or things or particular interests, *Reynolds, supra,* at 562, the notion of representative democracy within the federalist framework presumes that States may group individual voters together in a way that will let them choose a representative not only acceptable to individuals but ready to represent widely shared interests within a district.   Aleinikoff & Issacharoff, Race and Redistricting: Drawing Constitutional Lines After *Shaw v. Reno,* 92 Mich. L. Rev. 588, 601 (1993) ("It is only as collective partisans of the same political preference—whether that preference is defined by party or race or any other measure—that voters can assert their right to meaningful participation in the political process").   Hence, in respecting the States' implementation of their own, traditional districting criteria, the Court has recognized the basically associational character of voting rights in a representative democracy.

---

[3] As Professor Issacharoff notes, our vote-dilution cases acknowledged that "the right to cast an effective ballot implied more than simply the equal weighting of all votes . . . .   To be effective, a voter's ballot must stand a meaningful chance of effective aggregation with those of like-minded voters to claim a just share of electoral results.   For this reason, any sophisticated right to genuinely meaningful electoral participation must be evaluated and measured as a group right . . . ."   Issacharoff, Groups and the Right to Vote, 44 Emory L. J. 869, 883 (1995); see also Davidson, The Recent Revolution in Voting Rights Law Affecting Racial and Language Minorities, in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990, p. 23 (C. Davidson & B. Grofman eds. 1994) ("Ethnic or racial vote dilution takes place when a majority of voters, by bloc voting for its candidates in a series of elections, systematically prevents an ethnic minority from electing most or all of its preferred candidates . . . .   Vote dilution not only can deprive minority voters of the important symbolic achievement of being represented by preferred members of their own group, it can deprive them of a committed advocate in councils of government . . . [and] of the substantial benefits that government bestows . . .").

A

Accordingly, before *Shaw I*, the Court required evidence of substantial harm to an identifiable group of voters to justify any judicial displacement of these traditional districting principles. Such evidence existed in *Reynolds* v. *Sims, supra,* when the disparate weighting of votes was held unconstitutional, and it was present again when the Court recognized the unconstitutional consequences of vote dilution, see *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *White* v. *Regester,* 412 U. S. 755 (1973). In the one case, the harm was mathematically identifiable; in the other, the arithmetic provided powerful circumstantial evidence of the impossibility of political success for the chosen candidate of a racial and numerical minority in an area with pervasive racial-bloc voting. In both cases, the complainants were from an easily identified group of voters; and even in cases of racial vote-dilution claims, which were conceptually more difficult to state than the principle of one person, one vote, there were readily recognized examples of the harm in question. Indeed, even when one acknowledged that voters would be served by a representative not of their own race and that the Constitution guaranteed no right to pick a winner, see *Whitcomb, supra,* at 153–155, it was impossible to see mere happenstance in the facts that the American voting-age population was 10.5% black, but the Congress that assembled in 1981 had only 17 black representatives out of 435 and no black senator. Statistical Abstract of the United States, 1982–83, p. 490 (103d ed. 1982) (Table 802); Black Americans: A Statistical Sourcebook 142 (L. Hornor ed. 1995) (Table 4.02); see also Parker, The Damaging Consequences of the Rehnquist Court's Commitment to Color-Blindness Versus Racial Justice, 45 Am. U. L. Rev. 763, 770–771 (1996) (observing that "[p]rior to the latest round of redistricting after the 1990 Census, . . . [b]lacks, who constitute 11.1% of the nation's voting age population, made up only 4.9% of the members of Congress"). The conclusion was inescapable that what we

know of as intentional vote dilution accounted for this astonishing fact,[4] just as it is equally inescapable that remedies for vote dilution (and hedges against its reappearance) in the form of majority-minority districts account for the fact that the 104th Congress showed an increase of 39 black Members over the 1981 total. Minorities in Congress, 52 Cong. Q., Supplement to No. 44, p. 10 (Nov. 12, 1994); see also Parker, *supra*, at 771 (noting "a fifty percent increase in the number of black members of Congress").[5]

---

[4] See Pildes, The Politics of Race, 108 Harv. L. Rev. 1359, 1369 (1995) (reviewing Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990 (C. Davidson & B. Grofman eds. 1994)) (noting that studies of Southern States demonstrate that, as a result of racial-bloc voting, "the probability of a district's electing a Black representative was less than 1% regardless of a district's median family income, its percentage of high school graduates; its proportion of residents who were elderly, urban, foreign-born, or who had been residents of the state for more than five years; or the region of the country in which the district was located"); *id.*, at 1375 (finding similar results nationwide). There is, of course, reason to hope that conditions are improving. See *infra*, at 1076 (discussing elections in which crossover voting favors minority incumbents and in which racial issues have not played a significant role in the outcome). As I discuss in detail in Part IV, *infra*, I believe that these improvements may be attributed in large part to the effect of the Voting Rights Act, and thus to our willingness to allow race-conscious districting in certain situations.

[5] I recognize, of course, that elsewhere we have imposed prohibitions on the consideration of race, but contexts are crucial in determining how we define "equal opportunity." Consider our decisions on peremptory jury challenges. There, as in politics, one race may not have had a fair shake from the other. But the differences between jury decisionmaking and political decisionmaking are, I believe, important ones. Politics includes choices between different sets of social values, choices that may ultimately turn on the ability of a particular group to enforce its demands through the ballot box. Jury decisionmaking is defined as a neutral process, the impartial application of law to a set of objectively discovered facts. To require racial balance in jury selection would risk redefining the jury's role. Without denying the possibility that race, especially as an imperfect proxy for experience, makes a difference in jury decisionmaking (and, in some cases, legitimately so), it seems to me that the better course is to

1052

Before *Shaw I*, we not only thus limited judicial interference with state districting efforts to cases of readily demonstrable harm to an identifiable class of voters, but we also confined our concern with districting to cases in which we were capable of providing a manageable standard for courts to apply and for legislators to follow. Within two years of holding in *Baker* v. *Carr*, 369 U. S. 186 (1962), that malapportionment was a justiciable issue, "the Court recognized that its general equal protection jurisprudence was insufficient for the task and announced an increasingly rigid, simple to apply, voting-specific mandate of equipopulousity." Karlan, Still Hazy After All These Years: Voting Rights in the Post-*Shaw* Era, 26 Cumberland L. Rev. 287, 299 (1996) (hereinafter Karlan, Post-*Shaw* Era). Likewise, although it is quite true that the common definition of a racial vote-dilution injury ("less opportunity . . . to participate in the political process and to elect representatives . . . ," 42 U. S. C. § 1973(b)) is no model of concrete description, the Court has identified categories of readily comprehensible evidence bearing on the likelihood of such an injury, including facts about size of minority population, quantifiable indications of political cohesiveness and bloc voting, historical patterns of

ensure a fair shake by denying each side the right to make race-based selections. The cost of the alternative is simply too great. It is an entirely different matter, however, to recognize that racial groups, like all other groups, play a real and legitimate role in political decisionmaking. It involves nothing more than an acknowledgment of the reality that our concepts of common interest, geography, and personal allegiances are in many places simply too bound up with race to deny some room for a theory of representative democracy allowing for the consideration of racially conceived interests. A majority of the Court has never disagreed in principle with this position. See, *e. g., Shaw I*, 509 U. S. 630, 642 (1993) (noting that race-conscious redistricting is not always unconstitutional); *Miller* v. *Johnson*, 515 U. S. 900, 928–929 (1995) (O'CONNOR, J., concurring) (consideration of race in the redistricting process does not always violate the Constitution); *ante*, at 958 (opinion of O'CONNOR, J.) (noting that strict scrutiny does "not apply merely because redistricting is performed with consciousness of race").

success or failure of favored candidates, and so on. See, *e. g.,* *Thornburg* v. *Gingles,* 478 U. S. 30 (1986); *White* v. *Regester,* 412 U. S., at 766–770. The particularity of this evidence goes far to separate victims of political "inequality" from those who just happened to support losing candidates.

## B

*Shaw I,* however, broke abruptly with these standards, including the very understanding of equal protection as a practical guarantee against harm to some class singled out for disparate treatment. Whereas malapportionment measurably reduces the influence of voters in more populous districts, and vote dilution predestines members of a racial minority to perpetual frustration as political losers, what *Shaw I* spoke of as harm is not confined to any identifiable class singled out for disadvantage. See *Shaw* v. *Hunt, ante,* at 923–925, 928 *(Shaw II)* (STEVENS, J., dissenting) (noting the absence of a customary disadvantaged class and describing the *Shaw I* cause of action as a substantive due process, rather than an equal protection, claim). If, indeed, what *Shaw I* calls harm is identifiable at all in a practical sense, it would seem to play no favorites, but to fall on every citizen and every representative alike. The Court in *Shaw I* explained this conception of injury by saying that the forbidden use of race "reinforces the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls," and that it leads elected officials "to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Shaw I,* 509 U. S., at 647–648. This injury is probably best understood as an "expressive harm," that is, one that "results from the idea or attitudes expressed through a governmental action, rather than from the more tangible or material consequences the action brings about." Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluat-

ing Election-District Appearances after *Shaw v. Reno,* 92 Mich. L. Rev. 483, 506–507 (1993); see also *id.,* at 493 ("The theory of voting rights [that *Shaw I*] endorses centers on the perceived legitimacy of structures of political representation, rather than on the distribution of actual political power between racial or political groups"). To the extent that racial considerations do express such notions, their shadows fall on majorities as well as minorities, whites as well as blacks, the politically dominant as well as the politically impotent. Thus, as an injury supposed to be barred by the Equal Protection Clause, this subject of the "analytically distinct" cause of action created by *Shaw I, supra,* at 652, bears virtually no resemblance to the only types of claims for gerrymandering we had deemed actionable following *Davis* v. *Bandemer,* 478 U. S. 109 (1986), those involving districting decisions that removed an identifiable class of disfavored voters from effective political participation. See, *e. g., Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); *Thornburg* v. *Gingles, supra.*[6]

Just as the logic of traditional equal protection analysis is at odds with *Shaw*'s concept of injury, so the Court's rhetoric of racially motivated injury is inapposite to describe the consideration of race that it thinks unreasonable. Although the Court used the metaphor of "political apartheid" as if to refer to the segregation of a minority group to eliminate its association with a majority that opposed integration, *Shaw I, supra,* at 647, talk of this sort of racial separation is not on point here. The *de jure* segregation that the term "political

---

[6] Leaving aside the question whether such a catholic injury can be a violation of the Equal Protection Clause, there still might be a use of race that harms all district voters because it is used to an unreasonable degree. But see *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 489 (1982). But the Court has never succeeded in identifying how much is too much, having adopted a "predominant purpose" test that amounts to a practical repudiation of any hope of devising a workable standard. See Part I–C, *infra.*

apartheid" brings to mind is unconstitutional because it emphatically implies the inferiority of one race. See *Brown* v. *Board of Education*, 347 U. S. 483, 494 (1954) ("To separate [minority children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community"). *Shaw I*, in contrast, vindicated the complaint of a white voter who objected not to segregation but to the particular racial proportions of the district. See Karlan, Our Separatism? Voting Rights as an American Nationalities Policy, 1995 U. Chi. Legal Forum 83, 94 (hereinafter Karlan, Our Separatism) (noting the irony of using the term "apartheid" to describe what are "among the most integrated districts in the country"). Whatever this district may have symbolized, it was not "apartheid." Nor did the proportion of its racial mixture reflect any purpose of racial subjugation, the district in question having been created in an effort to give a racial minority the same opportunity to achieve a measure of political power that voters in general, and white voters and members of ethnic minorities in particular, have enjoyed as a matter of course. In light of a majority-minority district's purpose to allow previously submerged members of racial minorities into the active political process, this use of race cannot plausibly be said to affect any individual or group in any sense comparable to the injury inflicted by *de jure* segregation. It obviously conveys no message about the inferiority or outsider status of members of the white majority excluded from a district. And because the condition addressed by creating such a district is a function of numbers, the plan implies nothing about the capacity or value of the minority to which it gives the chance of electoral success.

Added to the anomalies of *Shaw I*'s idea of equal protection injury and the rhetoric of its descriptions, there is a further conceptual inadequacy in *Shaw I*. Whereas it defines injury as the reinforcement of the notion that members of a racial group will prefer the same candidates at the polls, the imme-

diate object of the constitutional prohibition against the intentional dilution of minority voting strength is to protect the right of minority voters to make just such a preference effective. There would, for example, be no vote dilution by virtue of racial-bloc voting unless voters of a racial minority would themselves tend to stick together in voting for a given candidate (perhaps, though not necessarily, of their own race, as well). Indeed, if there were no correlation between race and candidate preference, it would make no sense to say that minority voters had less opportunity than others to elect whom they would; they would be part of the mainstream and the winners would be their own choices. When voting is thus racially polarized, it is just because of this polarization that majority-minority districts provide the only practical means of avoiding dilution or remedying the dilution injury that has occurred already. *Shaw I* has thus placed those who choose to avoid the long-recognized constitutional harm of vote dilution at risk by casting doubt on the legitimacy of its classic remedy; the creation of a majority-minority district "reinforces" the notion that there is a correlation between race and voting, for that correlation is the very condition on which the success of the court-ordered remedy depends. So it is that the Court's definition of injury is so broad as to cover constitutionally necessary efforts to prevent or remedy a violation of the Fourteenth and Fifteenth Amendments and of § 2 of the Voting Rights Act.

One way to temper the overreach of the Court's concept of injury (though it would not avoid the difficulty that there is no equal protection injury in the usual sense, discussed above, see *supra*, at 1050) would be simply to exclude by definition from *Shaw I* injury a use of race in districting that is reasonably necessary to remedy or avoid dilution; the Court's move at least in this direction, see *infra*, at 1066–1069, is a sound one, as is its continuing recognition (despite its broad definition of harm) that not every intentional creation of a majority-minority district requires strict scrutiny.

See *ante,* at 958; *ante,* at 993 (O'CONNOR, J., concurring); cf. *Miller,* 515 U. S., at 928 (O'CONNOR, J., concurring). But the suggested qualification would fall short of eliminating the difficulty caused by the existing definition, for the uses of race to remedy past dilution or to hedge against future dilution are not the only legitimate uses of race that are covered, and threatened, by the overbreadth of the *Shaw* injury. This will become clear in examining the Court's efforts to solve its definitional problems by relying upon the degree to which race is used in defining the injury it discerns.

C

The Court's failure to devise a concept of *Shaw* harm that distinguishes those who are injured from those who are not, or to differentiate violation from remedy, is matched by its inability to provide any manageable standard to distinguish forbidden districting conduct from the application of traditional state districting principles and the plans that they produce. This failure, while regrettable, need not have occurred, for when the Court spoke in *Shaw I* of a district shape so "bizarre" as to be an unequivocal indication that race had influenced the districting decision to an unreasonable degree, *Shaw I* could have been pointing to some workable criterion of shape translatable into objective standards. Leaving *Shaw*'s theoretical inadequacies aside, it would have been possible to devise a cause of action that rested on the expressive character of a district's shape, and created a safe harbor in the notion of a compact district objectively quantified in terms of dispersion, perimeter, and population. See Pildes & Niemi, 92 Mich. L. Rev., at 553–575. Had the Court followed this course, the districts whose grotesque shapes provoke the sharpest reaction would have been eliminated in racially mixed States, which would have known how to avoid *Shaw* violations and, thus, federal judicial intrusion. *Shaw* would have been left a doctrinal incongruity, but not an unmanageable one.

The Court, however, rejected this opportunity last Term in *Miller* v. *Johnson, supra,* when it declined to contain *Shaw* by any standard sufficiently quantifiable to guide the decisions of state legislators or to inform and limit review of districting decisions by the courts. The Court rejected shape as a sufficient condition for finding a *Shaw* violation, or even a necessary one. 515 U. S., at 915. See also Issacharoff, The Constitutional Contours of Race and Politics, 1995 S. Ct. Rev. 45, 56 (hereinafter Issacharoff, Constitutional Contours) (*"Miller* is rather categorical in its refusal to limit the application of the equal protection clause to bizarre districts alone"). Instead, it recharacterized the cause of action in terms devised in other cases addressing essentially different problems, by proscribing the consideration of race when it is the "predominant factor motivating the legislatur[e]," 515 U. S., at 916, or when the use of race is "in substantial disregard of customary and traditional districting practices," *id.,* at 928 (O'CONNOR, J., concurring).

As a standard addressed to the untidy world of politics, neither "predominant factor" nor "substantial disregard" inspires much hope.[7] It is true of course that the law rests certain other liability decisions on the feasibility of untangling mixed motives, and courts and juries manage to do the untangling. See, *e. g., Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 287 (1977) (employee's burden to show that constitutionally protected conduct is a "substantial factor" in

---

[7] See *Cannon* v. *North Carolina State Bd. of Ed.,* 917 F. Supp. 387, 391 (EDNC 1996) (describing this "difficult area of the law" and predicting that it will "gain better definition by reason of an imminent decision by the Supreme Court of the United States [in *Shaw II*]"); Briffault, Race and Representation After *Miller v. Johnson,* 1995 U. Chi. Legal Forum 23, 50 (1995) ("[I]t is unclear what work the adjectives 'predominant' and 'overriding' do in the Supreme Court's test"); Karlan, Post-*Shaw* Era 287 (*Miller* "further unsettled the already unclear roadmap" of *Shaw I*); Issacharoff, Constitutional Contours 60 ("[T]he Court's facile reliance on standards of causation vaguely reminiscent of tort law does nothing to defer confronting the hard issue of acceptable standards of conduct").

decision not to rehire him; employer's burden to show that it would have made same decision "even in the absence of the protected conduct"); *Hunter* v. *Underwood*, 471 U. S. 222, 228 (1985) ("Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind the enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor"); but see *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one"). At first glance, then, it may not seem entirely out of the question for courts to sort out the strands in *Shaw* cases. But even this cool comfort would be misplaced.

While a court may be entitled to some confidence that in most cases it will be able, for example, to distinguish the relative strength of an employer's dissatisfaction with an employee's job performance from his displeasure over a worker's union membership, see *NLRB* v. *Transportation Management Corp.*, 462 U. S. 393, 403–405 (1983), such confidence would be unwarranted in the districting context. It is not merely that the very nature of districting decisions makes it difficult to identify whether any particular consideration, racial or otherwise, was the "predominant motive," though that is certainly true:

> "Districting plans are integrated bundles of compromises, deals and principles. To ask about the reason behind the design of any one particular district is typically to implicate the entire pattern of purposes and trade-offs behind a districting plan as a whole. Searching for 'the reason' or 'the dominant reason' behind a particular district's shape is often like asking why one year's federal budget is at one level rather than another. Moreover, to require a coherent explanation for the spe-

cific shape of even one district is to impose a model of legalistic decisionmaking on the one political process that least resembles that model." Pildes & Niemi, *supra*, at 585–586 (footnote omitted).

The reason that use of the predominant motive standard in reviewing a districting decision is bound to fail is more fundamental than that: in the political environment in which race can affect election results, many of these traditional districting principles cannot be applied without taking race into account and are thus, as a practical matter, inseparable from the supposedly illegitimate racial considerations. See Pildes & Niemi, *supra*, at 578 ("[R]ace frequently correlates with other socioeconomic factors. In evaluating oddly shaped districts, this correlation will require courts to attempt to untangle legitimate communities of interest from the now-illegitimate one of race. If blacks as blacks cannot be grouped into a 'highly irregular' district, but urban residents or the poor can, how will courts distinguish these contexts, and under what mixed-motive standard?"); Issacharoff, Constitutional Contours 58 ("Given the palpability of racial concerns in the political arena, [*Miller*'s causation standard could] either doom all attempts to distribute political power in multi-ethnic communities or . . . fail to provide a basis for distinguishing proper from improper considerations in redistricting").

If, for example, a legislature may draw district lines to preserve the integrity of a given community, leaving it intact so that all of its members are served by one representative, this objective is inseparable from preserving the community's racial identity when the community is characterized, or even self-defined, by the race of the majority of those who live there. This is an old truth, having been recognized every time the political process produced an Irish or Italian or Polish ward.

"[E]thnicity itself can tie people together, as volumes of social science literature have documented—even people with divergent economic interests. For this reason, ethnicity is a significant force in political life. . . .

.        .        .        .        .

". . . The creation of ethnic districts reflecting felt identity is not ordinarily viewed as offensive or demeaning to those included in the delineation." *Miller* v. *Johnson,* 515 U. S., at 944–945 (GINSBURG, J., dissenting).

Or take the traditional principle of providing protection for incumbents. The plurality seems to assume that incumbents may always be protected by drawing lines on the basis of data about political parties. Cf. *ante,* at 967–968, 970–971. But what if the incumbent has drawn support largely for racial reasons? What, indeed, if the incumbent was elected in a majority-minority district created to remedy vote dilution that resulted from racial-bloc voting? It would be sheer fantasy to assume that consideration of race in these circumstances is somehow separable from application of the traditional principle of incumbency protection, and sheer incoherence to think that the consideration of race that is constitutionally required to remedy Fourteenth and Fifteenth Amendment vote dilution somehow becomes unconstitutional when aimed at protecting the incumbent the next time the census requires redistricting.

Thus, it is as impossible in theory as in practice to untangle racial consideration from the application of traditional districting principles in a society plagued by racial-bloc voting[8] with a racial minority population of political significance, or at least the unrealized potential for achieving it. And it

---

[8] Even in areas where there is no racial-bloc voting, the application of certain traditional districting principles may involve a legitimate consideration of race.

is for just this fundamental reason that a test turning on predominant purpose is incapable of producing any answer when traditional districting principles are applied in the political environment in which *Shaw I* actions are brought.

## II

*Shaw I*'s recognition of a misuse of race in districting even when no vote dilution results thus rests upon two basic deficiencies: first, the failure to provide a coherent concept of equal protection injury, there being no separably injured class and no concept of harm that would not condemn a constitutionally required remedy for past dilution as well as many of the districting practices that the Court is seeking to preserve; second, the failure to provide a coherent test for distinguishing a "predominant" racial consideration from the application of traditional districting principles in a society whose racial mixture is politically significant and where racial-bloc voting exists. The necessary consequence of these shortcomings is arbitrariness; it is impossible to distinguish what is valid from what is not, or to decide how far members of racial minorities may engage "in the same sort of pluralist electoral politics that every other bloc of voters enjoys." Karlan, Our Separatism 103. Indeed, if one needed further proof of this arbitrariness, one need go no further than JUSTICE STEVENS's dissent in this case. The plurality effectively concedes that JUSTICE STEVENS has not unfairly applied the principles governing the *Shaw* cause of action, cf. *ante*, at 971, n. (noting that "[i]n the application of our precedents to District 30, our disagreement with JUSTICE STEVENS' dissent, *[ante]*, at 1014–1031, is largely factual"); in my judgment he has faithfully applied those principles in the spirit intended by the plurality. And yet the conclusions that the two sides reach after applying precisely the same test could not be more different.

Along with this endemic unpredictability has come the destruction of any clear incentive for the States with substantial minority populations to take action to avoid vote dilution. Before *Shaw*, state politicians who recognized that minority vote dilution had occurred, or was likely to occur without redistricting aimed at preventing it, could not only urge their colleagues to do the right thing under the Fourteenth Amendment, but counsel them *in terrorem* that losing a dilution case would bring liability for counsel fees under 42 U. S. C. § 1988(b) or 42 U. S. C. § 1973*l*(e). See Issacharoff, Constitutional Contours 48 ("Minority political actors could leverage not only their political power but the enforcement provisions of Section 5 of the Voting Rights Act, and the threat of suit under Section 2 of the Act against adverse districting decisions"); cf. *Hastert* v. *Illinois State Bd. of Election Commr's*, 28 F. 3d 1430, 1444 (CA7 1993) (awarding fees to the prevailing parties in a case in which the state legislature failed to draw congressional districts, over the Board of Elections's objection that it had "no interest in the eventual outcome except that there *be* an outcome" for it to implement) (emphasis in original). But this argument is blunted now, perhaps eliminated in practice, by the risk of counsel fees in a *Shaw I* action. States seeking to comply in good faith with the requirements of federal civil rights laws "now find themselves walking a tightrope: if they draw majority-black districts they face lawsuits under the equal protection clause; if they do not, they face both objections under section 5 of the Voting Rights Act and lawsuits under section 2." Karlan, Post-*Shaw* Era 289. See *ante*, at 1037 (STEVENS, J., dissenting) ("On one hand, States will risk violating the Voting Rights Act if they fail to create majority-minority districts. If they create those districts, however, they may open themselves to liability under *Shaw* and its progeny"). The States, in short, have been told to get things just right, no dilution and no predominant consider-

ation of race short of dilution, without being told how to do it. The tendency of these conflicting incentives is toward a stalemate, and neither the moral force of the Constitution nor the mercenary threat of liability can operate effectively in this obscurity.

As a consequence, where once comprehensible districting obligations confronted the legislators and governors of the States, there is now a vacuum of responsibility in any State with the mixed population from which *Shaw* suits come. We can no longer say with the old assurance that such States have a duty to comply with federal requirements in districting, since a State, like an individual, can hardly be blamed for failing to fulfill an obligation that has never been explained. It is true, of course, that a State may suffer consequences if the ultimate arbiter decides on a result different from the one the State has put in place, but that bad luck does not change the fact that a State cannot be said to be obliged to apply a standard that has not been revealed. Because the responsibility for the result can only be said to rest with the final arbiter, the practical responsibility over districting has simply shifted from the political branches of the States with mixed populations to the courts, and to this Court in particular. "The Court has apparently set itself upon a course of . . . reviewing challenged districts one by one and issuing opinions that depend so idiosyncratically on the unique facts of each case that they provide no real guidance to either lower courts or legislatures." Karlan, Post-*Shaw* Era 288. The tragedy in this shift of political responsibility lies not only in the fact of its occurrence in this instance, but in the absence of coherent or persuasive justifications for causing it to occur.

## III

Although today's cases do not address the uncertainties that stem from *Shaw*'s underlying incoherence, they do aim to mitigate its inscrutability with some specific rules.

A

In each of today's cases, the Court expressly assumes that avoiding a violation of the Voting Rights Act qualifies as a sufficiently compelling government interest to satisfy the requirements of strict scrutiny. See *ante*, at 977 ("As we have done in each of our three previous cases . . . , we assume without deciding that compliance with the results test [of § 2 of the Voting Rights Act] . . . can be a compelling state interest"); *Shaw II, ante*, at 915 ("We assume, *arguendo*, for the purpose of resolving this case, that compliance with § 2 could be a compelling interest"). While the Court's decision to assume this important point, *arguendo*, is no holding, see *Seminole Tribe of Fla.* v. *Florida, ante*, at 125 (SOUTER, J., dissenting), the assumption itself is encouraging because it confirms the view that the intentional creation of majority-minority districts is not necessarily a violation of *Shaw I, ante*, at 958 (strict scrutiny does not "apply to all cases of intentional creation of majority-minority districts"), and it indicates that the Court does not intend to bring the *Shaw* cause of action to what would be the cruelly ironic point of finding in the Voting Rights Act of 1965 (as amended) a violation of the Fourteenth Amendment's equal protection guarantee. Cf. Pildes & Niemi, 92 Mich. L. Rev., at 498 (observing that "[i]f the Court believed there were serious constitutional questions with the fundamental structure of this scheme, the Court had numerous means to avoid permitting an unconstitutionally composed legislature to assume power," and seeing the reservation of this question in *Voinovich* v. *Quilter*, 507 U. S., at 157, as "evidence that a majority of the Court is not prepared to find a general ban on race-conscious districting in the Constitution"). JUSTICE O'CONNOR's separate opinion, *ante*, at 990–992, bears on each of these points all the more emphatically, for her view that compliance with § 2 is (not just *arguendo*) a compelling state interest and her statement of that position virtually insulate the Voting Rights Act from jeopardy under *Shaw* as such.

## B

The second point of reference to come out of today's cases is the rule that if a State begins its map-drawing efforts with a compact majority-minority district required by *Gingles*, the State may not rely too heavily on racial data in adjusting that district to serve traditional districting principles. While this rule may indeed provide useful guidance to state legislatures, its inherent weakness is clear from what was said above, *supra*, at 1060–1062: it is in theory and in fact impossible to apply "traditional districting principles" in areas with substantial minority populations without considering race. As to some of those principles, to be sure, the ban on the overuse of racial data may not have much significance; racially identified communities can be identified in other ways and will be, after today. But protecting a minority incumbent may be another matter, since we cannot assume, as the plurality does, that reliance on information about "party affiliation" will serve to protect a minority incumbent, and we cannot tell when use of racial data will go too far on the plurality's view, *ante*, at 962–963. It therefore may well be that loss of the capacity to protect minority incumbency is the price of the rule limiting States' use of racial data. If so, it will be an exceedingly odd result, when the whole point of creating yesterday's majority-minority district was to remedy prior dilution, thus permitting the election of the minority incumbent who (the Court now seems to declare) cannot be protected as any other incumbent could be.

## C

The third point of reference attributable to today's cases is as yet only a possibility; a suggestion in the discussions of the narrow tailoring test that States seeking to avoid violating § 2 of the Voting Rights Act may draw the district that the Voting Rights Act compels, and this district alone. See *Shaw II, ante*, at 915–918 (rejecting North Carolina's District 12 because it does not sufficiently coincide with the

assumed *Gingles* district); *ante,* at 1035 (STEVENS, J., dissenting) ("[I]t now seems clear that the only way that a State can both create a majority-minority district and avoid a racial gerrymander is by drawing . . . within the 'limited degree of leeway' granted by the Court . . . the precise compact district that a court would impose in a successful § 2 challenge"). If the Court were to say that a district drawn to avoid dilution must respond to the dilution threat in some geographically exact way, but see *Shaw II, ante,* at 916, n. 8 (suggesting that States may have flexibility in complying with § 2 of the Voting Rights Act); *ante,* at 1037 (STEVENS, J., dissenting) (noting that States traditionally have enjoyed a broader discretion in drawing district lines), then presumably a district drawn in a race-conscious fashion could survive only if it was as compact as the *Gingles* district hypothesized for purposes of stating a vote-dilution claim, and positioned where the hypothetical district would be.

If the Court ultimately were to reach such a conclusion, it would in one respect be taking a step back toward *Shaw I* and its suggestion that a district's shape might play an important, if not determinative role in establishing a cause of action. Such a step would, however, do much more than return to *Shaw I,* which suggested that a compact district would be a safe haven, but not that the district hypothesized under *Gingles* was the only haven. See, *e. g., Shaw I,* 509 U. S., at 646 ("The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions").

I refer to this step as a "possibility" deliberately. The Court in *Shaw II* does not go beyond an intimation to this effect, and *Bush* raises doubt that the Court would go so far. See *ante,* at 977–978 (rejecting the argument made by JUSTICE STEVENS); see also *ante,* at 978 ("[T]he States retain a flexibility that federal courts enforcing § 2 lack . . . . And nothing that we say today should be read as limiting 'a State's discretion to apply traditional districting princi-

ples'"); but see *ante,* at 994 (O'CONNOR, J., concurring) ("[I]f a State pursues that compelling interest by creating a district that 'substantially addresses' the potential liability, and does not deviate substantially from a hypothetical court-drawn §2 district for predominantly racial reasons, its districting plan will be deemed narrowly tailored" (citations omitted)); but see also *ante,* at 977 ("We also reaffirm that the 'narrow tailoring' requirement of strict scrutiny allows the States a limited degree of leeway in furthering such interests. . . . We thus reject, as impossibly stringent, the District Court's view of the narrow tailoring requirement, that 'a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria'" (citation omitted)).  Indeed, *Bush* leaves open the possibility that a State could create a majority-minority district that does not coincide with the *Gingles* shape so long as racial data are not overused, *ante,* at 962, 981, and it does not suggest that a *Shaw* claim could be premised solely on a deviation from a *Gingles* district.

Suffice it to say for now that if the Court were to try to render *Shaw* more definite by imposing any such limitations on shape and placement, the added measure of clarity would either be elusive or it would come at an exorbitant price from States seeking to comply with the Voting Rights Act and the Fourteenth and Fifteenth Amendments.  It would be elusive if the Court meant that race could be considered in alleviating racial dilution but not in applying any traditional districting principle: we have already seen that race is inextricably intertwined with some common districting principles when applied in a multiracial society.  See *supra,* at 1060–1062.  Or it would come at an exorbitant price, because no other districting principle would be allowed to affect the compactness or placement that would be required for purposes of *Gingles.*  The Court would thus be cutting back on a State's power to vary district shape through its application of the very districting principles that are supposed to pre-

dominate in importance over racial consideration. That is, the Court would be reducing the discretion of a State seeking to avoid or correct dilution to the scope of a federal court's discretion when devising a remedy for dilution. There could, of course, be no justification for taking any such step. While there is good reason to limit a federal court's discretion to interfere in a State's political process when it employs its remedial power in dilution cases, cf. *Voinovich* v. *Quilter*, 507 U. S., at 156 ("Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States . . . to conduct apportionment"), there is no apparent reason to impose the same limitations upon the discretion accorded to a State subject to an independent constitutional duty to make apportionment decisions, see *ibid.* ("Because the States . . . derive their reapportionment authority . . . from independent provisions of state and federal law, . . . the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements") (internal quotation marks omitted). The principles of federalism that we have tried to follow strongly counsel against imposing any such limitations.

## D

In sum, the three steps the Court takes today toward a more definite cause of action either fail to answer the objections to *Shaw I* or prompt objections of their own. Recognition of a State's interest in complying with the Voting Rights Act does not address the practical impossibility courts will encounter in identifying a predominant use of race, as distinguished from some lesser, reasonable consideration of it, when a State applies its customary districting principles. The limitation on the use of racial data is unlikely to make much difference in practice except to jeopardize minority incumbency protection. And the possibility that the Court will require *Gingles* districts (or districts substantially close

to them) when compliance with § 2 of the Voting Rights Act is an object of districting would render a State's districting obligation more definite only by eliminating its ability to apply the very districting principles traditionally considered to be important enough to furnish a theoretical baseline of reasonable districting practices.

IV

If today's developments fall short of curing *Shaw*'s unworkability, it must be said that options for addressing them are few. Assuming that *Shaw* is not to be overruled as a flawed experiment, the Court may select from two alternatives, depending on whether its weightier concern is to preserve traditional districting principles or to cure the anomalies created by *Miller*'s "predominant purpose" criterion.

If the Court's first choice is to preserve *Shaw* in some guise with the least revolutionary effect on districting principles and practice, the Court could give primacy to the principle of compactness and define the limits of tolerance for unorthodox district shape by imposing a measurable limitation on the bizarre, presumably chosen by reference to historical practice (adjusted to eliminate the influence of any dilution that very practice may have caused in the past, cf. Pildes & Niemi, 92 Mich. L. Rev., at 573–574, n. 246 (discussing the egregious racial gerrymanders of the 19th century)) and calculated on the basis of a district's dispersion, perimeter, and population. See *id.*, at 553–575. This alternative would be true to *Shaw I* in maintaining that a point can be reached when the initially lawful consideration of race becomes unreasonable and in identifying appearance as the expression of undue consideration; and it would eliminate *Miller*'s impossible obligation to untangle racial considerations from so-called "race-neutral" objectives (such as according respect to community integrity and protecting the seats of

incumbents) when the racial composition of a district and voter behavior bar any practical chance of separating them. The incongruities of *Shaw*'s concept of injury when considered in light of our customary equal protection analysis, our remedial practice, and traditional respect for state districting discretion would, of course, persist, but if *Shaw* were defined by measures that identified forbidden shape as the manifestation of unreasonable racial emphasis, we would at least provide the notice and guidance that are missing from the law today.

The other alternative for retaining a *Shaw* cause of action in some guise would be to accept the fact that, in the kind of polarized multiracial societies that will generate *Shaw* actions as presently understood, racial considerations are inseparable from many traditional districting objectives, making it impossible to speak of race as predominating. The consequence of facing this reality is that if some consideration of race is to be forbidden as supposedly unreasonable in degree, then the use of districting principles that implicate the use of race must be forbidden. That is, traditional districting practices must be eliminated. Such a result would, of course, be consistent with *Shaw I*'s concept of injury as affecting voters of whatever race. But cf. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 489 (1982) (fact that some expressive harms are insufficient to satisfy Article III standing requirements does not allow for relaxation of those requirements). The result, in short, would be colorblindness in determining the manner of choosing representatives, either by eliminating the practice of districting entirely, or by replacing it with districting on some principle of randomness that would not account for race in any way.

While such is the direction in which *Shaw* and *Miller* together point, the objections to following any such course seem insurmountable. The first is the irony that the price

of imposing a principle of colorblindness in the name of the Fourteenth Amendment would be submerging the votes of those whom the Fourteenth and Fifteenth Amendments were adopted to protect, precisely the problem that necessitated our recognition of vote dilution as a constitutional violation in the first place. Eliminating districting in the name of colorblindness would produce total submersion; random submersion (or packing) would result from districting by some computerized process of colorblind randomness. Thus, unless the attitudes that produce racial-bloc voting were eliminated along with traditional districting principles, dilution would once again become the norm. While dilution as an intentional constitutional violation would be eliminated by a randomly districted system, this theoretical nicety would be overshadowed by the concrete reality that the result of such a decision would almost inevitably be a so-called "representative" Congress with something like 17 black members. See *supra*, at 1050. In any event, the submergence would violate the prohibition of even nonintentional dilution found in §2 of the Voting Rights Act. The only way to avoid this conflict would be to declare the Voting Rights Act unconstitutional, a prospect hardly in harmony with the Court's readiness to assume today that compliance with the Voting Rights Act qualifies as a compelling state interest for purposes of litigating a *Shaw* claim.

The second objection is equally clear. Whatever may be the implications of what I have called *Shaw*'s failings, the Court has repeatedly made it plain that *Shaw* was in no way intended to effect a revolution by eliminating traditional districting practice for the sake of colorblindness. *Shaw I*, 509 U. S., at 642 ("Despite their invocation of the ideal of a 'color-blind' Constitution, see *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting), appellants appear to concede that race-conscious districting is not always unconstitutional. . . . That concession is wise: This Court

never has held that race-conscious state decisionmaking is impermissible in *all* circumstances"); cf. *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 520–521 (1989) (SCALIA, J., concurring in judgment) (criticizing the majority for rejecting a strict principle of colorblindness). Indeed, the very fear that led to the creation of the *Shaw* cause of action was that racial concerns were taking too heavy a toll on districting practices that had evolved over the years through the political process. *Shaw I*, 509 U. S., at 644–649. JUSTICE O'CONNOR, moreover, has made it obvious that race has a legitimate place in districting, *id.*, at 642 ("[R]ace-conscious redistricting is not always unconstitutional"); *Miller*, 515 U. S., at 928–929 (O'CONNOR, J., concurring); *ante*, at 993 (O'CONNOR, J., concurring), that the intentional creation of majority-minority districts is not forbidden by *Shaw*, *Miller*, *supra*, at 928 (O'CONNOR, J., concurring) (districts may be permissible "even though race may well have been considered in the redistricting process"); *ante*, at 990–992 (O'CONNOR, J., concurring), and that *Shaw* was aimed at only the exceptional district, 515 U. S., at 928–929 ("Application of the Court's standard does not throw into doubt the vast majority of the Nation's 435 congressional districts"). Of the present Court majority, only JUSTICES SCALIA and THOMAS are on record as concluding that any intentional creation of a majority-minority district is a forbidden racial gerrymander. *Ante*, at 1001 (THOMAS, J., concurring in judgment).

Since a radical transformation of the political selection process in the name of colorblindness is out of the question, the Court's options for dealing with *Shaw*'s unworkability are in truth only these: to confine the cause of action by adopting a quantifiable shape test or to eliminate the cause of action entirely. Because even a truncated *Shaw* would rest on the untenable foundation I have described, and the supposed, expressive harm *Shaw* seeks to remedy is unlikely

to justify the disruption that even a modified *Shaw* would invite, there is presently no good reason that the Court's withdrawal from the presently untenable state of the law should not be complete. While I take the commands of *stare decisis* very seriously, the problems with *Shaw* and its progeny are themselves very serious. The Court has been unable to provide workable standards, the chronic uncertainty has begotten no discernible reliance, and the costs of persisting doubt about the limits of state discretion and state responsibility are high.

There is, indeed, an added reason to admit *Shaw*'s failure in providing a manageable constitutional standard and to allow for some faith in the political process. That process not only evolved the very traditional districting principles that the Court has pledged to preserve, but has applied them in the past to deal with ethnicity in a way that should influence our thinking about the prospects for race. It is difficult to see how the consideration of race that *Shaw* condemns (but cannot avoid) is essentially different from the consideration of ethnicity that entered American politics from the moment that immigration began to temper regional homogeneity. Recognition of the ethnic character of neighborhoods and incumbents, through the application of just those districting principles we now view as traditional, allowed ethnically identified voters and their preferred candidates to enter the mainstream of American politics, see *Miller, supra*, at 944–945 (GINSBURG, J., dissenting); D. Judd, The Politics of American Cities: Private Power and Public Policy 70 (3d ed. 1988); see generally S. Erie, Rainbow's End: Irish-Americans and the Dilemmas of Urban Machine Politics, 1840–1985 (1988), and to attain a level of political power in American democracy. The result has been not a state regime of ethnic apartheid, but ethnic participation and even a moderation of ethnicity's divisive effect in political practice. For although consciousness of ethnicity has not disappeared from the

American electorate, its talismanic force does appear to have cooled over time.[9]    It took Boston Irish voters, for example, to elect Thomas Menino mayor in 1993.[10]

---

[9] See Karst, Paths to Belonging: The Constitution and Cultural Identity, 64 N. C. L. Rev. 303, 347, 350 (1986) ("[T]he surest path to assimilation is participation in the larger society's activities and institutions.    Voting is not just an expression of political preferences; it is an assertion of belonging to a political community. . . ."    "When legislative districts are defined in ways that exclude the possibility of significant minority representation, potential minority voters see that their votes are not worth casting.    Yet electoral mobilization is vital . . . to the group members' perceptions that they belong to the community"); Walzer, Pluralism in Political Perspective, in The Politics of Ethnicity 1, 18 (S. Thernstrom, A. Orlov, & O. Handlin eds. 1982) ("[P]olitical life is in principle open, and this openness has served to diffuse the most radical forms of ethnic competition"); Kantowicz, Voting and Parties, in The Politics of Ethnicity, *supra*, at 29, 45 (noting that political successes and recognition made members of an ethnic group "feel that it belonged in the wider society . . . [and brought] them inside the political system"); Mintz, Ethnicity and Leadership: An Afterword, in Ethnic Leadership in America 198 (J. Higham ed. 1978) (concluding after reviewing several studies of ethnic politics that "we ignore at our peril the need to understand those processes by which being short-changed . . . politically can become any group's motto or battle standard"); cf. Karlan, Our Separatism 102 ("two generations of communist suppression and ethnic and religious tension in Yugoslavia did little to ensure stability, tolerance, or integration").

[10] See, *e. g.*, Nolan, Boston Mayoral Race Could Break Dominance of Ethnicity, Boston Globe, Apr. 9, 1993, p. 40 ("When Boston finishes choosing a new mayor, the city may discover that after centuries of immigration, ethnicity is no longer the dominant factor in its politics"); Black, Once-Solid Voting Blocks are Splitting in Boston, Boston Globe, Nov. 1, 1993, p. 1 (commenting that voters consider Menino's Italian descent "little more than a historical footnote" and observing that "ethnic voting has faded . . . [a]s various groups enter the American economic and social mainstream . . . [and] gain some semblance of [political] power"); D'Innocenzo, Gulotta Can't Count on Ethnicity, Newsday, Oct. 19, 1993, p. 97 (noting that "[t]he vowel at the end of Tom Gulotta's name may not matter in this year's county executive election as it once did" because "Italian-Americans in Nassau County are likely to go to the polls with more than ethnic favoritism in mind"; attributing the decline in ethnicity-based voting to the

There is, then, some reason to hope that if vote dilution is attacked at the same time that race is given the recognition that ethnicity has historically received in American politics, the force of race in politics will also moderate in time. There are even signs that such hope may be vindicated, even if the evidence is necessarily tentative as yet. See U. S. Comm'n on Civil Rights, The Voting Rights Act: Ten Years After, p. 155 (Jan. 1975) ("In many areas the great increase in minority registration and voting since the passage of the Voting Rights Act in 1965 has meant that politicians can no longer afford to ignore minority voters. This has brought about a significant decline in racial appeals by candidates and has made incumbents and candidates more responsive to minority needs"); Carsey, The Contextual Effects of Race on White Voter Behavior: The 1989 New York City Mayoral Election, 57 J. of Politics 221, 228 (1995) (reporting, in 1994, that "the contextual effects of race may not be so different from the contextual effects of factors like partisanship, ethnicity, or social class as we might have believed"); Sigelman, Sigelman, Walkosz, & Nitz, Black Candidates, White Voters: Understanding Racial Bias in Political Perceptions, 39 Am. J. of Political Science 243, 244 (1995) ("Over the years, white Americans have expressed increasing willingness to vote for black candidates"); Peirce, Fresh Air in City Hall, Baltimore Sun, Nov. 8, 1993, p. 7A ("In contest after contest, victory has gone to mayoral candidates who eschew talk of race"); see also *Gingles*, 478 U. S., at 56 (noting that crossover voting in favor of minority candidates is more common when minority incumbents stand for reelection); *Collins* v. *Norfolk*, 883 F. 2d 1232, 1243 (CA4 1989) (same). This possibility that racial politics, too, may grow wiser so long as minority votes are rescued from submergence should be considered in determining how far the Fourteenth and Fifteenth Amendments require us to devise constitutional common law to supplant

fact that "Nassau Italian-Americans feel less marginali[zed] as an ethnic group").

the democratic process with litigation in federal courts. It counsels against accepting the profession that *Shaw* has yet evolved into a manageable constitutional standard, and from that case's invocation again today I respectfully dissent.